Elvira VECCHIONE et al.

v.

Helene WOHLGEMUTH et al.

Civ. A. No. 73–162.

United States District Court,
E. D. Pennsylvania.

June 30, 1978.

**34**

Judy Greenwood, Community Legal Service, David Ferleger, Herbert B. Newberg, Philadelphia, Pa., for plaintiffs.

Robert B. Hoffman, Norman Watkins, and Allen C. Warshaw, Harrisburg, Pa., for defendant.

Thomas K. Gilhool, Frank J. Laski, and Edward A. Stutman, Philadelphia, Pa., Michelle C. White and Robert Manara, ABA, Mental Health Advocacy Project, Wernersville, Haverford and Norristown, Pa., for objectors.

OPINION AND ORDER

EDWARD R. BECKER, District Judge.

I. *Preliminary Statement*

This opinion addresses a motion to approve a proposed settlement whereby the decree that we entered on July 11, 1974, *Vecchione v. Wohlgemuth*, 377 F.Supp. 1361 (E.D.Pa.1974) [hereinafter *Vecchione I*], will at last be implemented. The proposed settlement is opposed by three organizations and several individuals. The principal opposition comes from the Pennsylvania Association of Retarded Citizens (PARC). PARC asserts that the settlement, which we had heretofore thought was deemed by all concerned to advance substantially the rights of mental patients in Pennsylvania, in fact stigmatizes the mentally retarded (though concededly not the mentally ill). Understanding of the issues before us requires a lengthy recitation of the factual and legal history of the case.

This is a civil rights case, brought under 42 U.S.C. § 1983. It deals with the right of patients confined in state mental hospitals in Pennsylvania to control and manage their own property as against: (1) the right of the Commonwealth summarily to seize and control it for the duration of the hospitalization without prior notice or hearing on the issue of the patient's competency to control that property; and (2) the right of the Commonwealth to appropriate part of the patient's property in satisfaction of the cost of care and maintenance, without prior or subsequent hearing on the correctness of the Commonwealth's assessment.

The case arises within the framework of sections 424 and 501 of the Pennsylvania Mental Health and Mental Retardation Act of 1966 (Act), 50 P.S. §§ 4424 and 4501.[1]

---

1. The relevant portions of these provisions are quoted below.

 § 4424. *Funds of persons admitted or committed to State operated facilities*

 Where no guardian has been appointed for a mentally disabled person admitted or committed to a State operated facility all money and other personal property of such person shall be handled in the following manner,

unless the director determines that such person's recovery or well-being will be promoted by his own handling of such money or personal property:

 (1) The authorized agent of the Department of Revenue shall, without application to any court, take custody of, receive and manage in accordance with this section any money or other personal property in such per-

Section 501 provides that persons receiving diagnosis, treatment, care and rehabilitation at state mental hospitals are responsible for all costs thereof. Section 424 provides that, as to all persons who are civilly admitted or committed to a state mental hospital but who are not adjudged incompetent, the revenue agent at the hospital shall, without application to any court, seize any and all possessory property and present entitlements payable to such persons, manage those assets and appropriate from them the costs of such persons' care and maintenance as assessed by the revenue agent under § 501 of the Act. On the other hand, as to all persons who are adjudged incompetent,[2] § 424 requires the revenue agent to turn over all money or property of such persons to their guardians with a full and certified accounting. Payment of any mo-

nies to the Commonwealth in satisfaction of its § 501 claims out of the estates of those patients adjudged incompetent must be preceded by prior notice and prior judicial hearing and approval, by virtue of the Incompetents' Estates Act of 1955, 50 P.S. § 3101 et seq. In addition, § 424 requires the Commonwealth to initiate proceedings under the Incompetents' Estates Act of 1955 for appointment of a guardian, if none exists already, for the estate of any patient with assets in excess of $2,500 at the time of the patient's admission to the mental institution. Patients with $2,500 or less, however, do not receive such an opportunity to have their assets protected by a guardian or court under the Incompetents' Estates Act of 1955.

In *Vecchione I,* plaintiff contended that § 424 of the Act creates two classes of

son's possession at the time he is admitted to a facility and any gifts, legacies, pensions, insurance payments, retirement benefits or payments, old age and survivors' insurance, or any other benefits or payments to which such person covered by the provisions of this act may be entitled.

(2) The revenue agent shall, upon the director's request, turn over to the director the sum of one hundred dollars ($100) to be used as such person's petty cash fund. Funds so held by the director shall be disbursed at his discretion to promote the welfare of such person. The revenue agent shall, upon the director's request, restore the balance in each such person's petty cash fund to one hundred dollars ($100). For special purposes, the director may request funds for such person up to five hundred dollars ($500).

(3) Unless a guardian has been appointed and qualified, the revenue agent shall hold, apply and dispose of all funds in accordance with regulations promulgated by the department.

(4) Whenever the money and other personal property of such person exceeds two thousand five hundred dollars ($2,500) in value, the revenue agent shall request the Department of Justice to apply for the appointment of a guardian of such person's estate in accordance with the act of February 28, 1956 (P.L. 1154), known as the "Incompetents' Estates Act of 1955."

(5) When such guardian has been appointed and qualified pursuant to this section or in any other manner, he shall be entitled to receive from the revenue agent all money and other personal property in the custody of such revenue agent belonging to the person for whom he has been appointed guardian.

All funds transmitted to the guardian shall be accompanied by a statement certified as true and correct and setting forth, in detail, a full accounting of such person's funds.

(6) Whenever such money and other personal property exceed two thousand five hundred dollars ($2,500.00) in value and the court rules that a guardianship is not appropriate, then such money and other personal property shall be handled in accordance with this section.

\* \* \* \* \* \*

§ 4501. *Liability of mentally disabled persons*

Whenever public funds are expended under any provision of this act on behalf of a mentally disabled person, the governmental body expending such funds may recover the same from such person subject to the regulations of the department and for this purpose liability is hereby imposed upon such person admitted, committed or otherwise receiving any service or benefit under this act for all costs, payments or expenditures with reference thereto, including but not being limited to the costs of admission or commitment, transportation, treatment, training, maintenance, complete care, partial care or aftercare and discharge.

Standards for assessment of liability used by the revenue agent are set forth by the Department of Public Welfare at DPW–MH/MR Manual § 5200, Appendix II.

2. A person may only be declared "incompetent" by a court of appropriate jurisdiction, as the term "incompetent" is defined in § 102(3) of the Pennsylvania Incompetents' Estates Act of 1955, 50 P.S. § 3102(3).

civilly admitted or committed patients for purposes of Due Process safeguards. One class, composed of all patients who have not been adjudged incompetent, is denied any prior notice of hearing before the Commonwealth takes control of those patients' assets and appropriates part of such assets to satisfy § 501 claims. Another class, composed of patients adjudged incompetent, is afforded both notice and hearing before the Commonwealth can seize control of their funds and appropriate them to satisfy § 501 assessments. Section 424 further separates these two classes by requiring the Commonwealth to seek, under the Incompetents' Estates Act of 1955, the appointment of a guardian for patients with assets in excess of $2,500, thereby augmenting the latter class. As to those patients with less than $2,500, however, the Act does not require the Commonwealth to give them the benefit of notice or an opportunity for a hearing on whether they are incompetent. Thus, these patients generally have no guardian or court to protect their assets, and so are relegated to the former, disadvantaged class. Ironically, under the aegis of § 424, although patients with more than $2,500 of assets receive prior notice and hearing on the question of competency, if they are declared competent at such a hearing, the Commonwealth can then act under § 424 to take control of and appropriate their funds without any further notice of hearing.

Plaintiff submitted that there is no legitimate state interest in differentiating between these two classes of patients and that the statutory classification offends the Equal Protection Clause of the Fourteenth Amendment. Plaintiff's second claim was that to the extent that these statutes fail to provide prior notice and prior opportunity for full and fair hearing before the Commonwealth takes control of and/or appropriates a mental patient's funds for payment of the Commonwealth's claims, they are invalid as contrary to the Due Process Clause of the Fourteenth Amendment.

Plaintiff Elvira Vecchione was, at the time that this action was brought, a patient at the Philadelphia State Hospital at Byberry (Byberry). She had not been declared incompetent, and her assets were less than $2,500. Plaintiff sued in her own behalf and in behalf of all mental patients who were *sui juris* or were persons not adjudged incompetent and with assets less than $2,500, and who were civilly admitted or committed to Pennsylvania State hospitals for observation, diagnosis, care, and treatment and subject to §§ 424 and 501 of the Act. In the prayer of her complaint, plaintiff sought declaratory and injunctive relief and also restitution of the sums withheld by the revenue agents. Since the action sought to enjoin enforcement by a state officer of statutes of statewide application, a three-judge court was convened.

On July 11, 1974, writing on behalf of the three-judge court in *Vecchione I*, we declared that § 424 read in conjunction with § 501 offended the equal protection and due process clauses of the Fourteenth Amendment, and issued an injunction against further application of § 424. The injunction was couched in purely negative terms; rather than hold a further hearing for the purpose of prescribing steps to implement the original decree, we left it to the responsible state officials, working with counsel for the plaintiffs, to fashion appropriate procedures for compliance.

We did not act during the pendency of *Vecchione I* upon plaintiff's motion for class certification. *See Vecchione I,* 377 F.Supp. at 1364 n. 3. However, on December 19, 1977, we entered an order certifying *nunc pro tunc* as of July 11, 1974, a class consisting of "all persons who have been or may be hospitalized in state institutions for the mentally ill and/or mentally retarded at any time since July 11, 1974."

It should be noted at the outset of this opinion that in human terms, *Vecchione I* had a very significant impact, for it afforded many mental patients in Pennsylvania the right to handle their own financial affairs. Even so, we were aware at the time of its filing that compliance with the *Vecchione I* decree would be a major undertaking that could not be accomplished in a brief period of time. In our worst night-

mares, however, we could not have foreseen the problems which in slow but steady temporal sequence arose and approached Olympian heights.

The first phase of implementation problems related to the Commonwealth's total failure, for many many months, to act to implement the decree. When the Secretary of Welfare and the other responsible officials were called to account by a motion to adjudge them in contempt of court for failure to implement the decree, they countered with motions under Fed.R.Civ.P. 60(b). These motions (1) attacked *Vecchione I* on the ground that we had adjudicated a case not properly before us (*i. e.* that we lacked subject matter jurisdiction); and (2) sought to repudiate an April 4, 1975 consent decree (hereinafter "consent decree"), which was the instrument finally devised, in the wake of the contempt motions, to implement *Vecchione I,* on the ground that the general counsel for the Pennsylvania Department of Welfare who signed the consent decree was unauthorized to do so. This chapter of the proceedings and the grounds for our denial of the defendants' motions are set forth at length in *Vecchione v. Wohlgemuth,* 426 F.Supp. 1297 (E.D.Pa.), *aff'd,* 558 F.2d 150 (3d Cir.), *cert. denied sub nom. Beal v. Vecchione,* 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977) [hereinafter *Vecchione II*]. As *Vecchione II* chronicles, other major obstacles had also developed, including the problem of obtaining suitable guardians for the mental patients in view of the relatively small sums of money involved, the resistance of the state court system to handling *Vecchione* guardian petitions, and the unwillingness of the Commonwealth to pay back some 9 million dollars which it had wrongfully withheld from mental patients after *Vecchione I* and which it was bound to repay by the terms of the consent decree.

During the pendency of the *Vecchione II* litigation, we achieved partial implementation of the *Vecchione I* decree by: (1) issuing interim orders that provided that the (former) duties of the revenue agents would be performed by guardian officers employed by the Department of Public Welfare (DPW); and (2) developing a plan for preliminary determinations of competency, a screening process whereby significant numbers of mental patients could be preliminarily determined competent to handle their own funds, thereby obviating the necessity for intervention of a guardian or representative payee.[3]

Regrettably, the foregoing recitation far from fully describes the problems that *Vecchione* fostered. For while *Vecchione II* was pending in the Court of Appeals, the Pennsylvania Secretary of Welfare, on the advice of counsel, decided to withdraw completely Pennsylvania's participation in dispersal of federal benefits to institutionalized beneficiaries in order to avoid the strictures of *Vecchione I.* Accordingly, the appropriate federal officials were notified that, as of June 6, 1977, all Commonwealth officials would resign as representative payees for federal benefit programs, *e. g.,* Social Security, V.A., Railroad Retirement, Civil Service Retirement. The impact of such resignation upon the thousands of persons in Pennsylvania mental hospitals would have been utterly devastating. When they became aware of this notification, plaintiffs moved promptly for a temporary restraining order. We granted a temporary restraining order on June 1, 1977, which has been continued in effect, by agreement, since that time.

After the Court of Appeals rendered its *Vecchione II* decision, Linda Taub, among others, moved to intervene as plaintiffs in the case. Linda Taub is a retarded person, and she sought relief similar to that re-

**3.** As *Vecchione II* explains, most of the funds involved in *Vecchione* procedures are received from the Social Security Administration or other federal agencies. The Pennsylvania Revenue Department Agents were holding these funds pursuant to *representative payee* procedures established by agreement with the relevant federal agency. Despite defendants' contention to the contrary, we held that Social Security benefits paid to revenue agents were in fact administered in accordance with § 424. *Vecchione II,* 426 F.Supp. at 1305.

quested in the original complaint.[4] The defendants answered the intervenors' complaint and moved for judgment on the pleadings. The motion raised substantial defenses, which had not before been addressed, to the merits of the plaintiffs' claims. In a more important development, we scheduled a hearing on the motions for contempt against the Secretary of Welfare and other state officials; the pending contempt motions were now ripe for determination in the wake of the Court of Appeals decision in *Vecchione II.*

At this juncture all the parties were desirous of finding a way out of the morass. Holding the Secretary of Welfare in contempt and solving the payback problem would not have concluded the matter; only implementation of *Vecchione I* by an appropriate due process substitute would do so. We thereupon redoubled our efforts to discover a formula that would finally and fairly settle the seemingly intractable controversy which threatened, via appeals and sundry stratagems, to be virtually interminable. We did so by presiding over a protracted series of negotiations which continued relentlessly for the next nine months.[5]

Our first order of business was to deal with the proposed resignation of Commonwealth officials as representative payees for federal benefit programs, for the plan to withdraw Pennsylvania's participation in the dispersal of federal benefits threatened to leave thousands of patients at Pennsylvania mental institutions without the means to obtain benefits unless the Social Security Administration and other involved agencies were able to secure, upon short notice, thousands of individuals or organizations to act as representative payees. In that connection we welcomed the participation in our negotiating sessions of Louis Enoff, Deputy

Regional Commissioner of the Social Security Administration, Department of H.E.W.

Commissioner Enoff embarked upon a broad-based effort to obtain County MH/MR organizations and relatives of the mental patients to act as representative payees to replace the Commonwealth officials who had been performing that service. However, as he had reported to us during our negotiations and testified at our hearing on the settlement proposal, his efforts were largely unsuccessful.[6] Accordingly, it became extremely important to achieve a *permanent* accommodation that would keep the Commonwealth officials as representative payees. To this end, a further series of interim orders were negotiated which solidified the concept of a state guardian office and led to the ultimate solution of an independent office of guardian. Extensive negotiations ensued over the anatomy of the guardian office that would be established by the final agreement toward which we were working; what was sought was an *autonomous* guardian office with the duty to act as advocate for the fiscal rights of the class members.

The second major object of our concern was the payback of patients' moneys, dealt with at length in *Vecchione II.* Extensive study was required to identify the payback recipients and extensive negotiations were required to work out the payback terms, including the rate of interest to be paid to patients from whom funds had been withheld and the circumstances and conditions under which the payback recipients could be billed for care and maintenance. Subsumed within the latter topic of negotiation was the matter of patients' rights; our concern, *see Vecchione I,* was not to impose restrictions on the state's collection of funds from patients only to insure against conflict of

4. The motion to intervene was unopposed, but the attempt by these intervenors to obtain *nunc pro tunc* class certification was resisted. As previously noted, we ultimately granted the *nunc pro tunc* class certification request.

5. We met with counsel for the parties on June 21, 1977, July 8, 1977, September 16, 1977, September 30, 1977, October 5, 1977, October 25, 1977, December 8, 1977, January 4, 1978

and February 13, 1978. During each of these lengthy meetings we played an active mediation role. Additionally, counsel for the parties met in person, corresponded, and spoke by telephone on numerous occasions in further attempts to devise an amicable resolution.

6. He was able to procure representative payees only for about 25% of the patients.

interest, but also to assure the right to contest any assessed liability. In terms of the payback, attention also had to be given to disposition of unclaimed payback funds, for more than $250,000 was reported "unclaimed or dependents unknown." The payback matter was the first problem we were able to resolve, and it is currently in the process of being implemented. On the "bottom line," close to $9 million (including interest) will be paid back.

The negotiations addressed many if not most of the provisions of the 1975 consent decree and resulted in a number of modifications thereof. In many areas there was a sentence by sentence negotiation. Indeed, as we review the final agreement, we recognize few areas in which we did not arbitrate one dispute or another. Attention was given in the interim, of course, to the matter of the pending contempt proceedings. Extensive discovery was taken on that issue even while the negotiations proceeded. The defendants were insisting on withdrawal of the contempt and damage actions as a bargaining point. Finally, in the Spring of 1978, we were able to bring the parties together on the last detail.

The proposed settlement is quite complex. It is encompassed within a tripartite 28 page stipulation which includes regulations for a new autonomous Central Guardian office in the Department of Public Welfare (DPW). A copy of the stipulation is attached as an appendix to this opinion. Although we shall discuss the provisions of the settlement in detail *infra*, we briefly summarize its major facets here.

First, the settlement substantially incorporates the terms of the earlier April 4, 1975, Consent Order. That Order provides, *inter alia*, that: (1) there will be no deprivation of patient/residents' property absent court determination of incompetency;[6a] (2) non-custodial assistance with property management will be provided for competent patients, including transportation to banks and secure safekeeping of patient money at the institution; (3) detailed procedures will

be developed for preliminary determination of competency to ensure that competent patient/residents will have unimpeded control of their funds; and (4) fair billing procedures will be implemented with notice of rights accompanying all bills, the scheduling of conferences and hearings to adjust disputes, and the protection of confidentiality.

Second, the settlement establishes a new autonomous central office of Guardian within DPW. Third, it precludes the threatened resignation of Commonwealth officials as representative payees. Fourth, it encourages training programs for patients in self-dependence and financial competency. Fifth, it provides for periodic reports to the Court on implementation progress. Sixth, it adopts a five-percent interest rate, to be paid retroactively from April 4, 1975, on the earlier ordered payback. Seventh, it ensures the right of individual class members to assert claims for out-of-pocket expenses or losses without defendants raising a statute of limitations bar. Finally, the settlement resolves all outstanding motions for contempt against the defendants, including former Secretaries of Welfare Beal and Wohlgemuth, and settles the plaintiffs' claims for compensatory relief.

Needless to say, the settlement was a compromise and did not contain all that the plaintiffs (or defendants) desired. One provision that the plaintiffs had earnestly sought to obtain would have created a guardian office outside DPW, either within the Governor's office or elsewhere within the State governmental structure. Numerous contacts were made with representatives of the Governor's office, various legislators, and other officials in an attempt to achieve this result. In view of bureaucratic and fiscal limitations, however, this objective could not be obtained. We have urged the parties to continue to work toward this end in the future because we believe it desirable (though not necessary) to divorce the guardian office from DPW.

---

6a. These provisions do not, however, apply to recipients of Supplemental Security Income (SSI); SSI benefits are not subject to care and maintenance charges.

PARC's objections to the settlement, expressed in various forms, flow from one central theme: the settlement benefits the mentally ill, but allegedly harms the mentally retarded. *Inter alia*, PARC asserts that:

A. The settlement runs to the retarded as well as the mentally ill although the original action was only on behalf of "mental patients";

B. The mechanical skills of money management are improperly treated as indices of competence. The retarded, without such skills but able to make choices or preferences, are "very likely, albeit wrongly, to be adjudicated incompetent";

C. Guardianship proceedings may be abused and a greater chance of mistake is present for the retarded;

E. Use of less restrictive alternatives to the institution of guardianship proceedings should be explored, such as provision by the defendants of a system of "agents" to handle funds without a declaration of incompetency.

PARC's objections were also advanced through the vehicle of two motions. First, PARC moved, pursuant to Fed.R.Civ.P. 60(b)(4) for a declaration (1) that the consent decree of April 4, 1975 in this case is void for lack of Rule 23(e) notice to class members and because retarded people were not represented in connection with the decree's formulation, and (2) that the original (*Vecchione I*) order of July 11, 1974 is void because retarded people were not represented in the litigation. PARC's second motion was to alter or amend the 1977 class certification order by removing institutionalized retarded people from the class.

In view of the magnitude of the objections interposed by the PARC intervenors, we deem it appropriate to note that, during the course of the negotiations we have described, numerous contacts were made by counsel for the parties with counsel for the PARC objectors for the purpose, *inter alia*, of obtaining assistance and guidance in the settlement of the litigation, especially as it pertains to the retarded.[7] Indeed, counsel for the PARC objectors acknowledged at the hearing on the proposed settlement that PARC had been following the *Vecchione* litigation all along, but had consciously refrained from seeking to intervene or to participate in the ongoing mediation efforts. PARC's early intervention of course, would have put before us several years ago the positions that PARC advances now. We were also unaware of PARC's meetings with counsel for the parties referenced at note 7 *supra*. Had we been aware of PARC's approach we might well have pursued it, and the final settlement then might have taken a different form. All this said, however, we emphasize at the outset that although in a broad sense PARC's objections are untimely, we reject them not on that ground, but for substantive reasons. *See* Part II.A. *infra*.

Objections were also filed by the American Bar Association Advocacy Project (funded with state Department of Public Welfare funds) at three local state institutions.[8] While some of the Advocacy Project's objections tracked PARC's objections, it also asserted that: (1) a guardian ad litem should be provided at competency hearings; (2) a bond should be required of the guardian officers; (3) the conflicts of interest inherent in housing the Guardian Office in the Department of Public Welfare are so serious that "they cannot be cured;" and (4) "the duties of the guardian officers are so great and there is no provision in the stipulation to identify needed skills, train the staff and develop criteria by which to

---

7. The affidavits of plaintiffs and defendants detail numerous contacts between the plaintiffs' and defendants' attorneys and the PARC attorneys on the subject of the litigation and of the proposed settlement as it affected the retarded. *See* Affidavit of David Ferleger (plaintiffs' counsel) and joint affidavits of counsel for defendants at 3 and 4.

8. When the objections were filed, the ABA Project represented no client or class member. However, counsel for the Project have since entered their appearance for a mentally ill patient at a State Hospital.

govern caseloads." The Berks County Mental Health Association, on its own behalf (the Association represents no client or member of the plaintiff class) has objected to certain provisions of its settlement as follows:

(1) The referral of a hospital's opinion that a patient may be incompetent to the Justice Department by the Guardian Officer is a conflict of interest with the duty of the Guardian Officer to be "fiscal advocate."

(2) In Part II, Par. 2.24, no provision is made to ask the patient for a preference in choice of representative payee.

(3) There is no provision for patients to deal with abuse by institutional staff in making determinations or by the Guardian Officer in handling funds.

(4) There is no indication that patients will receive "clear notice" that they may challenge the billing of the revenue agent; and

(5) The Guardian Office should be open "for deposit and withdrawal" of funds of residents.

As has already been noted, we conducted a hearing on the proposed settlement.[9] Evidence was adduced by the PARC objectors from Bernard Nash, formerly executive director of the American Association of Retarded Persons and an expert on developing volunteer participation in various causes. Mr. Nash's experience lay particularly in recruiting volunteers for HEW's Foster Grandparent program. The thrust of Mr. Nash's testimony was that, with appropriate effort and funding, a system of "agents" could be established within Pennsylvania that could obviate the necessity for the "drastic remedy" of appointment of guardians for the retarded. The settlement hearing record was supplemented by a number of additional submissions, principally affidavits from counsel, numerous memoranda, and the transcripts of certain hearings on *Vecchione* guardianship petitions before Judge Joseph F. O'Kicki of the Court of Common Pleas of Cambria County, in which PARC objected (unsuccessfully) to the appointment of guardians.

As the foregoing chronicle suggests, this is, by far, the most vexatious litigation we have encountered since assuming this bench some 7½ years ago. We are now at the threshold of its final resolution. However, before we proceed with substantive discussion of the issues, we must note that, although what is before us is styled as a motion to approve a class action settlement under Fed.R.Civ.P. 23(e), these proceedings are really akin to those that we might have held to fashion an affirmative decree in the wake of *Vecchione I*. This is not, then, a classical proceeding to approve a settlement before judgment. This is a settlement, after judgment, concerning the terms of a remedial decree. And while we shall, just as though this were a conventional settlement, be mindful of the impact that a class action decree has upon absent individuals and so apply our best judicial discretion to assure that the "settlement" is fair, reasonable, adequate, and in the best interests of all persons affected, *see Girsh v. Jepson*, 521 F.2d 153 (3d Cir. 1975), we shall also be mindful that what is really at issue are the standards for fashioning equitable remedies, the applicable principle being that the remedy must be tailored to the constitutional violation. *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). As with any equity case, the nature of the violation determines the scope of the remedy. *Swann v. Charlotte-Mecklenburg*

---

**9.** Notice of the proposed settlement was given, pursuant to order of court: (1) by advertising in a form approved by the court in one newspaper of daily circulation in each county of the Commonwealth, at least ⅛ page in size and appearing for 5 days; (2) by posting and conspicuously maintaining a notice in a form approved by the Court in all wards and living areas of all state mental health and retardation facilities; (3) by causing the notice to be sent to all county MH/MR Program Administrators with a request that the notice be made available to directors of community mental health centers and county MH/MR base service units for all persons who may be affected hereby; and (4) by causing the notice to be sent to all statewide mental health and mental retardation community groups. Proof of service in compliance with the order has been filed.

*Board of Education,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971).

 We turn then to whether the "settlement" should be approved, whether the remedy that it provides is tailored to the constitutional violation found in *Vecchione I,* and whether the retarded are so disadvantaged by its terms that either the remedy should be rejected or the retarded should be excluded from its ambit (a point requiring us to discuss the requisites of Rule 23 certification). Because the class action discussion will be illuminated by a discussion of the merits of the "settlement," we shall take up that matter first. For reasons that follow, we deny PARC's motions, reject the various objections, and approve the settlement.[10]

## II. The Settlement

### A. The PARC Objections

Before taking up PARC's objections to the settlement or its motion to alter or amend the class it is important to put PARC's objections into perspective by noting carefully what PARC does not mention or object to. PARC neglected to mention that if the settlement is not approved as to the retarded or if the retarded are excluded from the class so that they do not receive the benefits of the settlement, they will then be relegated to the aegis of § 424 and will be deprived of property in violation of the due process and equal protection clauses. The unconstitutionality of § 424 has not been questioned by appeal of *Vecchione I* or otherwise, and PARC has at no time contended that § 424 is constitutional as applied to the retarded. The indignities and unconstitutional procedures to which the retarded would be subject under § 424 cannot thus escape our gaze while we consider the alleged disadvantage of stigmatization by guardianship proceedings.

Concomitantly—and we turn to PARC's first formulation of its objection—although

---

**10.** We need not labor PARC's motion under Rule 60(b)(4) asserting that the June 11, 1974 and April 4, 1975 orders were void. PARC's attack in those orders is founded on due process considerations. Thus, PARC contends that the retarded were not represented at all before the court in the proceedings which eventuated in the July 11, 1974 order and also that the April 4, 1975 order is void for want of due process as to retarded people who were not on Rule 23 notice of that second order.

There are, of course, two requisites to a valid judgment: jurisdiction over the subject matter and over the parties. But these orders have already been subjected to searching Rule 60(b)(4) scrutiny and upheld. *Vecchione II* established that there was jurisdiction over the subject matter and the parties, and our decision to that effect was affirmed by the Court of Appeals.

The July 11, 1974 (*Vecchione I*) order invalidated and enjoined state laws that applied to both the retarded and the mentally ill. It did no more than that. *PARC makes no claim that those laws were constitutional as applied to the retarded.* Insofar as the lack of representation argument has a class action referent, it is not cognizable because the action was not a class action as of that time. Moreover, class action defects do not render a judgment void. As the court clearly had jurisdiction over the subject matter and the parties, and as those facts are not even challenged by PARC, the Rule 60(b)(4) claim must be rejected as to the *Vecchione I* order.

PARC's argument as to the April 4, 1975 consent decree is equally lacking in merit. There had not been any class certification in this case prior to the 1974 judgment. When Walter Buress' motion to intervene was granted on April 4, 1975, there was no motion for class certification pending. Buress wanted his funds returned and (together with the original plaintiff) wanted the defendants to "design an appropriate due process substitute." A contempt hearing was scheduled. The defendants avoided contempt by agreeing to return Buress' funds and to obey the 1974 judgment by implementing a specified system for handling patients' funds. This became the April 4, 1975 order. As we have noted in the text this was not strictly speaking a settlement, but rather an implementation of the *Vecchione I* decree. But because the April 4, 1975 proceeding was not a "dismissal or compromise" of a certified class action, Rule 23(e), which permits *discretionary* notice to class members, does not apply at all. Indeed, even applying the rubric "settlement," the order was at most a settlement of a contempt. However, if it was something to which Rule 23(e) notice was applicable, that is still a matter of no practical consequence, for the April 4, 1975 stipulations will be supplemented by the one before us to implement the *Vecchione I* decree. Finally, the attack on the April 4, 1975 order is untimely and, if successful, would upset the elaborate payback provisions included therein.

there was much emphasis in the original action on the mentally ill, the scope of our judgment clearly placed the rights of all mentally disabled persons before the courts. There was no conflict in *Vecchione I* between the mentally ill and the mentally retarded because at the core of the case was a set of common needs: (1) to enable those mentally disabled persons—whether mentally ill or retarded—who were able to handle their financial affairs to do so sans interference by state revenue agents; and (2) to provide those mentally disabled persons—again, whether mentally ill or retarded—unable to handle their own affairs with due process, with assistance, and with protection, including a vehicle for challenging care and maintenance bills.

PARC has contended that because the proposals advanced to date for implementation of *Vecchione I* will energize guardianship petitions for large numbers of retarded persons, the retarded are disadvantaged. PARC contends that mechanical money management skills are not proper indicia of competence and that retarded persons without such skills are likely to be adjudicated incompetent wrongly. This problem was cognized in the implementation negotiations. Plaintiff's counsel developed rigorous forms and criteria for preliminary determinations of competence, and we insisted on high standards.[11] We believe that the elaborate preliminary determination screening process provided for in the proposed regulations has many built-in safeguards. According to the record, its interim application has already resulted in many mentally ill and mentally retarded persons (though concededly fewer mentally retarded) being afforded the opportunity to handle their own financial affairs instead of having them handled by revenue agents under

§ 424. It is only when individuals have been screened as incapable of managing their funds that any intrusion whatsoever occurs.

We have reviewed the record developed before Judge O'Kicki in the recent *Vecchione* guardianship proceedings and are attuned to PARC's arguments, founded on the testimony taken there, that competency means the ability to make choices and express preferences, not just the ability to handle money, and that there should be no presumption that someone who is retarded is per se incompetent. We do not disagree. But these notions are for the state officials—in the first instance the mental health administrators and in the final instance the Orphans Court Division Judges—to deal with. We will not presume that the psychiatrists in state institutions, bound to the Oath of Hippocrates, will not conscientiously perform their duties. Nor will we presume that State Court Judges, faithful to their oath, will not perform theirs. We reject the notion that the retarded, with or without able advocates such as PILCOP or PARC, are likely to be wrongly adjudged incompetent.[12]

Attention to the problems of the retarded is reflected in the settlement stipulation. Paragraph 6 of Part II, § A of the settlement stipulation provides that, for a retarded person, the preliminary determination may be made by a "psychologist or psychiatrist," and that the basis for the opinion must be stated. At ¶ 8(a) of Part II, § A, awareness of the differences between adaptive behavior and intellectual functioning is reflected by reference to the definitions of the American Association on Mental Deficiency regarding the retarded. In any event, whether a particular person is

11. Indeed, in one facet of the negotiations that we mediated, the parties agreed to a time-consuming and expensive scientific test of the preliminary determination procedures (a random sample at a number of institutions) to determine whether a panel system of competence evaluators arrived at different results than did a single professional evaluator (where the panel included non-professionals). The statistician reported no significant differences.

12. PARC, represented by PILCOP, assisted counsel for a number of residents of state institutions in the *Vecchione* guardianship proceedings before Judge O'Kicki in Cambria County. However, Judge O'Kicki was apparently unimpressed with PARC's arguments that guardians should not be appointed for the patients before him and proceeded to appoint guardians of the estate and of the person.

incompetent is a question not for the federal court but for the state court in the guardianship proceedings. These provisions, however, should help to avoid wrongful petitioning and/or adjudication. If PARC is dissatisfied with the statutory framework for or character of state guardianship proceedings, its recourse is to the state legislature or state courts. As a federal court, bound by considerations of restraint imposed by the federal system, *see Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), we have no carte blanche in the matter.

PARC has further asserted that guardianship proceedings may be abused and that a greater chance of that mistake is present for the retarded than for the mentally ill. There is no doubt that across the country there are instances of abuse and that mistakes are made, both by petitioners and by judges. However, no sound reason has been advanced that would lead us to conclude that such mistakes will be widespread, or that the retarded will have any more errors committed against them in such hearings than will the mentally ill. Since the defendants have the right—with or even without this litigation—to file incompetency petitions against the plaintiff class members, it is no objection to the settlement that abuse and mistakes may occur. The settlement does not encourage either the filing of petitions or the abuse of the process. To the contrary, a substantial number of retarded people will not be subject to petitions because they will have passed the preliminary determination on the competence side of the ledger. The proper forum for this objection is therefore another lawsuit or the state court trial and appeal process.

PARC next objects that the settlement will energize the filing of many guardianship petitions against retarded persons and that this is a counterproductive result because guardianship stigmatizes and rarely benefits the ward. Testimony to this effect was developed before Judge O'Kicki. It is doubtless true that guardianship adds some incremental stigma even beyond the existing stigmas of being labeled retarded or mentally ill and of being institutionalized. The question for us, then, is how much greater is the stigma of being declared incompetent to handle one's funds and how we should balance that increment against the proposed settlement's benefits of (1) eradicating the unconstitutional system of § 424; (2) having mentally disabled persons' funds administered in a fair way that provides for their needs (under the auspices of the appointing court); and (3) screening out of the thousands who will not have petitions filed against them. In our view, the balance lies heavily on the side of implementation of the settlement.

It is important in this regard to underscore not only that a judicial declaration of incompetency is only sought as the last resort but that, once sought, the individual is afforded all the due process protections of a full Orphans Court hearing. Where such declarations are necessary, the stigma of the incompetency determination is counterbalanced by the protection afforded the individual who cannot exercise choice. We cannot, in any event, abolish due process hearings simply to avoid determinations of incompetency. Finally, we note that the settlement assures that guardianship petitions cannot be filed where non-institutional "agents," including family members, agencies such as PARC, or county MH/MR associations, are available to serve as representative payee.

When the wheat is separated from the chaff, what emerges as PARC's major and most serious objection is that settlement is inadequate because, in lieu of the time honored state law that provides a system of guardianship, the settlement does not provide for a mandatory system of "agents" to handle people's funds without a declaration of incompetency. We were impressed with the PARC proposal, even as we read it. We believe then and believe now that it holds great promise and should be explored. It provides for a new kind of approach to the problem at hand, one that could result in an improvement in the condition of the retarded and in a saving to the taxpayers of the Commonwealth. As we have suggested

above, we were also chagrined that PIL-COP, PARC's legal representative, which had been tuned into this litigation for so long, had consciously refrained from calling their objections to our attention long before; had we been able to incorporate the PARC proposal into our negotiations, we might have made some interim progress towards an agency system.

PARC, however, has made a bit much of our receptivity to their proposal. In the wake of Mr. Enoff's experience we at once knew that there were potential problems with it. We enumerate those problems now. First, it is a new and experimental idea, not heretofore tried anywhere in the country. Second, there is no assurance that recruitment by PARC or by the state would fare any better than did HEW in its extensive search for Social Security representation progress (25% success). Third, an agency system lacks one important feature of the guardianship: the guardian is a fiduciary, appointed by and accountable to the court, whereas the agents would not be subject to an appointing court's control. Fourth, there are the inevitable problems of assuring free choice of agents by residents and of avoiding the abuses possible when two or more persons come forward, each asserting that they are the "agent" for the non-verbal mental patient or retarded person in a particular case. These are serious problems to be overcome in any agency system. We are not persuaded by the testimony of Mr. Nash that it would be a simple matter to develop a cadre of agents for the mentally retarded. We believe that it would be far more difficult to obtain a reliable system of agents for the mentally retarded than to recruit foster grandparents. Moreover, in a sense, the proposed settlement already incorporates a quasi-agent system in three respects:

1. At ¶ 4.1 of the regulations (page 11 of the settlement), it is provided that with residents' approval, the guardian officer "shall assist competent patients/residents in managing their funds." This is precisely an agent's role.

2. At ¶ 6.0 of the regulations (page 14 of the settlement), it is provided that the Guardian Office shall seek to establish training programs "for encouraging self-dependence and financial competency among patients/residents." This will help avoid guardianships and encourage use of the guardian officers for agent purposes.

3. At ¶ 3.2 of the regulations (page 7 of the settlement), it is provided that, while the guardian has the legal authority to make fiscal decisions, the "Guardian Officer shall consult with the client to the extent feasible. . . ."

■ Certainly due process does not require a system of agents. Neither has the guardianship system been adjudged offensive to due process. In considerable measure, PARC is seeking, under the guise of its objections to the settlement, to attack the system of guardianship; however, this case, at this stage, does not provide an appropriate forum to do so. Even assuming the "least restrictive alternative" principle is applicable to the determination of appropriate equitable remedy under these facts,[13]

---

**13.** The validity of that proposition is far from clear. There is a general principle, applicable for years in the First Amendment area, that a legitimate governmental purpose "cannot be pursued by means that broadly stifle fundamental personal liberties" when there are "less drastic means for achieving the same basic purpose." *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252, 5 L.Ed.2d 231 (1960). This "less drastic means" or "less restrictive alternative" test has been expanded by some courts into the due process arena in the area of involuntary commitment of the mentally ill. *Covington v. Harris,* 136 U.S.App.D.C. 35, 419 F.2d 617 (1969); *Wyatt v. Stickney,* 344 F.Supp. 373, (M.D.Ala.1972), *aff'd sub nom. Wyatt v. Aderholt,* 503 F.2d 1305 (5th Cir. 1974); *Kesselbrenner v. Anonymous,* 33 N.Y.2d 161, 350 N.Y.S.2d 889, 305 N.E.2d 903; *Stanus v. Leonhardt,* 414 F.Supp. 439 (S.D.Iowa 1976); *Welsch v. Likins,* 373 F.Supp. 487 (D.Minn. 1974); *Eubanks v. Clarke,* 434 F.Supp. 1022 (E.D.Pa.1977) (Lord, C.J.). It has also been extended into other areas. *Aptheker v. Secy. of State,* 378 U.S. 500, 84 S.Ct. 1659, 12 L.Ed.2d 992 (foreign travel); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (contraception); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (interstate travel and right to vote). On the

we do not believe at this juncture that the agency system is a viable alternative and believe that, in view of the discussion above, the system provided for in this settlement meets the "least restrictive alternative" standard.

We thus reject PARC's objections. However, we are sufficiently impressed with the prospects of an agency system that we will apply the *cy pres* doctrine and order that the unclaimed Vecchione payback funds (now totalling some $250,000) be applied to a pilot program testing the feasibility of an agency system.[14] If the pilot project proves successful, we trust that the Commonwealth will move towards that system, even if only because it promises to be less expensive than guardianship.

We turn now to those objections of the ABA project and the Berks County Mental Health Association that do not duplicate the objections asserted by PARC.

### B. *The Objections of the ABA Project and the Berks County Mental Health Association*

■ The ABA Project asserts that a guardian ad litem should be provided at competency hearings. That may well be a desirable idea, but the facts of this litigation do not make it an issue, much less mandate it. We do not have the power in this particular litigation to order use of a guardian ad litem in the state proceedings, for no state court official is a defendant. The ABA Project also objects that a bond should be required of guardian officers, but ¶ 1.151 of the regulations that are part of the settlement requires a bond.

■ The ABA's next and apparently major objection is that the conflicts of interest involved in housing the Guardian Office in the Department of Public Welfare (DPW) are so serious that they "cannot be cured." As we have indicated above, the matter of independence of the Guardian Office was one which concerned us greatly, and we sought to achieve a Guardian Office outside the framework of DPW. Although we were unsuccessful, we believe that what has emerged is an autonomous Guardian Office, one that will satisfy due process concerns. It is not uncommon for one governmental agency to house components that have the duty to protect and advocate the interests of classes of people subject to the influence of the agency. Also, government agencies often house executive/administrative components, on the one hand, and "impartial" decision-making components on the other. For example, see the hearings in the Social Security Administration conducted by Administrative Law Judges and the Unemployment Compensation Referees in the state system.

The Guardian Office is mandated to be autonomous by the instrument creating it. Its functions and duties, detailed over so many pages of the stipulation, make it clear that independence must be the norm, and that a lack of independence violates the decree and the regulations. The regulations reduce any possible conflict of interest to a minimum. One of the reasons why the Guardian Office was placed under the supervision of the Deputy Secretary for Social Services was that the negotiators felt that

---

other hand, the Supreme Court has specifically rejected the applicability of the least restrictive alternative to welfare regulations. *Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). *See Black v. Beame,* 419 F.Supp. 599 (S.D.N.Y.1976) aff'd 550 F.2d 815 (2d Cir. 1977).

This case does not deal with *commitment* of the mentally disabled but rather with the handling of the property of already committed mentally disabled persons. We have grave doubts as to whether the question of management of a mentally retarded person's property by a court appointed guardian *vel non* implicates a fundamental right. It would seem that the facts at bar align this case more with *Dandridge* and its progeny. Moreover, application of the least restrictive alternative principle here virtually presupposes the constitutional infirmity of the guardianship system, an issue not directly raised in these proceedings. Put differently, the "least restrictive" claims of the PARC objectors go far beyond the scope of this lawsuit and any judicially required remedy. However, in view of our conclusion that no realistic alternative has been shown, we need not decide the applicability of the least restrictive alternative principle.

14. The parties have consented to this provision.

that office was removed as far as possible within DPW from operation of the state mental hospitals. Most importantly, the guardian officers serve in that capacity by virtue of Court appointment, hence they are responsible, in a fiduciary capacity, to the Orphans Court Division of the Court of Common Pleas which appointed them. In sum, although the possibility of a conflict of interest exists, we believe that it is held to a sufficient minimum to warrant approval of the settlement.[15]

█ The ABA Project has also objected that the Guardian Office is understaffed and that its officers are overworked and unable to attend to their wards. They also complain that the guardian officers are heavily engaged in preparing data for guardianship petitions, a conflict of interest in and of itself. We trust that the staffing problems will be worked out and the burdens alleviated. We agree that guardian officers should not be preparing guardianship petitions and trust that any such activity will cease. Preparation of guardianship petitions is the functions of the State Justice Department. These objections are not, however, grounds for refusing to approve the settlement.

█ We treat here too the objections of the Berks County Mental Health Association. This association submitted some excellent suggestions for redrafting and improving the stipulation of settlement. We would like to have seen them incorporated, but the parties to the stipulation would not, in view of the odyssey that this litigation has been, agree to further changes. The plaintiffs have noted that the changes suggested by the Berks County Mental Hospital Association can, for the most part, be effected by proper implementation of the stipulation. We agree and urge the parties

to do so. However, while we might simply adopt the changes in our decree, that would alter the nature of the proceeding before us, which, is a motion to approve the parties' stipulation of settlement. To impose our own decree upon the parties at this juncture might precipitate appeals and years of further delay, the situation we have sought earnestly to avoid. To do so would also obscure the fact that, however many hearings we might have held with a view to the fashioning of a decree, we could not have thereby achieved the results that have been achieved by negotiation of the parties.

This latter observation, an important one we believe, stems from experience in a number of cases, including *Vecchione,* in which we have been called upon to implement sweeping injunctive decrees. Our modus procedendi in such cases has been to attempt, by painstaking mediation, to bring the parties to an agreement as to the terms of decree implementation. The parties have far more expertise than the court in such matters, are aware of budgetary restraints, and are able to surmount fiscal and administrative problems by accommodation (thus avoiding the polity-impairing confrontation which sometimes emanates from decrees imposed by federal courts). Additionally, where what we are developing are regulations for state agencies, it is eminently appropriate, particularly under current notions of federalism, that the state agencies affected be integrally involved in drafting the remedial schema.[16] Therefore, we affirm our preference for the settlement route followed here and decline to disrupt it by superimposing additional, unwanted, and unnecessary provisions upon the stipulation.

There are a number of important benefits of the stipulation of settlement that we have inadequately noted or stressed heretofore. We turn to them now.

---

15. The parties may wish to consult with the next state administration and the General Assembly with a view to locating the office outside DPW. In view of our previous comments, we would certainly not discourage them from doing so.

16. Thus, our procedure has been responsive to the Supreme Court's instruction that in situa-

tions comparable to this "the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution." *Milliken v. Bradley,* 433 U.S. 267, 280–81, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977).

## C. *Benefits of the Settlement*

Rather than a comprehensive overview, we now itemize a number—though not all—of the features of the settlement that benefit the members of the class. We add only that many of these beneficial features would probably not have been incorporated in a judicially imposed remedial decree, being beyond that which was strictly required to correct the constitutional deficiency. *Compare McGrath v. Weinberger,* 541 F.2d 249 (10th Cir. 1976).

1. The settlement includes a detailed preliminary screening process for competency determinations. Rather than freeing the state to petition against any patient, or even any patient that a doctor/psychologist certifies as incompetent, an elaborate system of notice and certifications, approval by institutional superintendents, and referral to the Justice Department is required.

2. The screening process assures that many class members will keep control of their funds, as they will not be found proper subjects for the petitioning process. The preliminary determination survey made several years ago indicates that this group includes mostly mentally ill patients, but that it also includes many mentally retarded patients.

3. Most patients in mental hospitals stay no longer than about 3 months. Many stay only a few days or weeks. The settlement substantially deters petitions against this majority of short-stay class members in at least two ways:

 a. No preliminary determinations of competence are made in the first 30 days of a resident's admission. Thus, the process does not even start for most patients.

 b. The defendants cannot seek to appropriate care and maintenance funds (even after a Guardian Officer is appointed guardian) until after six months from appointment. Thus, for short-stay class members, it is very unlikely that guardianship petitions will even be filed.

4. Once a guardian officer is appointed, class members under the settlement benefit from procedures that are not provided by state law and that protect them more than state law currently does.

 a. No care and maintenance disbursements are made unless a full and complete accounting is filed with the court.[16a]

 b. A six month waiting period is required before care and maintenance is paid.

 c. The guardian officer must file an affidavit that all abatement/modification grounds either have been asserted or do not exist.

 d. There is a required periodic review of a person's level of competence.

5. Consistent with the Fourteenth Amendment, no person will have his or her property taken away without extensive due process procedures, including a judicial determination of their status and need for guardianship.[16b] This constitutional benefit alone far outweighs any incremental stigma that such a determination would impose.

6. All persons in mental institutions—whether mentally ill or retarded—who cannot handle their funds on their own receive the assistance of an on-site guardian, who is responsible to the court.

7. All persons in mental institutions—whether mentally ill or retarded—who are capable of handling their funds but who want assistance in doing so can, without being declared incompetent, receive the assistance of the Guardian Office.

8. Competent residents are given access to local banks personally and by mail; secure safekeeping of property must be provided by the institution.

---

**16a.** The Stipulation requires that an accounting be filed annually; bills may be paid at any interval and without a contemporaneous accounting so long as an annual accounting is filed.

**16b.** *But see note 6a. supra.*

9. Bills for care and maintenance provide notice of the right to a hearing and the right to challenge the bill on grounds that are in addition to statutory grounds for challenge.

10. Residents challenging bills may not be treated differently by reason of their challenges.

11. If a patient or ex-patient fails to pay his or her bill, a judgment may not be executed against him or her unless there was a full hearing in which the person, if incompetent, was represented by a guardian ad litem.

12. Expenses or losses due to defendants' violations of the previous orders in this case may be filed with the state Board of Finance and Revenue and other appropriate forums. The defendants will waive the statute of limitations on such claims.

13. The Guardian Office is insulated and protected as much as possible from potential conflicts of interest. Detailed obligations for fiscal advocacy are imposed, civil service rules protect employees, and the Guardian Office is forbidden any involvement in treatment decisions.

14. The guardian officers are personally responsible for mismanagement of funds. Bonds are required for each of them.

15. If the patient consents, the guardian officer assists with applications for funds for the person.

16. The public (and groups like PARC) can receive notice of hearings and petitions filed under the decree.

17. The guardian officer must consult with clients even if the clients have been adjudged incompetent.

18. Accounts must be maintained in insured certificates and accounts.

19. Training programs are intended to help staff assist patients with financial matters.

It is our considered view that the settlement confers substantial benefits upon the class and that it corrects the constitutional defect in § 424 via a remedy tailored to the violation and without significant harm to members of the class. The foregoing discussion thus dictates that the objections to the stipulation of settlement be dismissed.[17] However, as we noted in the Preliminary Statement, the pendency of PARC's motion to alter or amend the class requires that we address PARC's arguments in terms of the requisites of Rule 23, to see if its strictures are met for a class consisting of both the mentally retarded and the mentally ill. That task will require us to rescribe a number of the arguments already advanced, albeit with a somewhat different focus. We shall try to do so expeditiously so as not unduly to prolong this opinion.

III. *The Motion to Alter or Amend the Class*

A. *Introduction*

PARC has asked us to "amend and alter" the December 19, 1977 class order by removing institutionalized retarded people from the certified class. Alleging that both the trial of the original complaint and the original judgment of 1974 were framed only in terms of the mentally ill but that the proposed settlement of the case would trigger guardianship proceedings for many retarded persons, PARC urges that we exclude the retarded entirely both from the original finding of the unconstitutionality of state laws and also from the proposed further relief now before the court. We decline to follow this suggestion, which we view as drastic and untoward, for the reasons that we have already stated and for those that follow.

Preliminarily, we note that it is clear from the amended and supplemental complaint of the plaintiff class that it includes the retarded. Linda Taub, for instance, one of the named plaintiffs, is a retarded resident of Woodhaven State School and Hospital. Moreover, all parties (and PARC) were, years ago, well aware of the effect of

17. We have disposed in this opinion of all the broad-based objections to the stipulation. There are a number of objections based upon the personal circumstances of the objectors which we have disposed of separately.

this case on both the mentally ill and the retarded, and all parties were in frequent contact with PARC on issues arising in the case. *See* note 7 *supra.* Nevertheless, at no time until now did PARC object to the inclusion of the mentally retarded in the plaintiff class. With the case at last so close to final resolution, it seems late in the day for PARC to seek exclusion of the retarded from this lawsuit.

We do not, however, base our refusal to accede to PARC's requests on the grounds of tardiness in filing objections to the class definition. If the class were improperly constituted under the criteria established by Fed.R.Civ.P. 23, we would not hesitate to redefine the class, or indeed dismiss the class action entirely if necessary, even on this very eve of settlement. Similarly, although notice to class members was not strictly required in this case,[18] were PARC able to demonstrate that the interests it claims to represent were prejudiced by a lack of notice either of the class membership or of some seriously detrimental implication of this case for the mentally retarded, the interests of justice well might demand some form of relief, at whatever time PARC made its objections known. Such factors, however, are not implicated here. Moreover, the very explicit and detailed requirements of Rule 23 for certifying classes and conducting class actions are designed to protect those whose interests do not properly track the asserted interests of the putative class representatives.

When, for example, a class is defined too broadly or the class representatives are not in fact adequately representative of the class as a whole, the Rule 23 standards serve to safeguard the rights of those who could be harmed by the res judicata effects of a class action judgment and to ensure that the requirements of due process have been satisfied. This is so because class actions by their very nature bind those who are not active participants in the court proceedings and who often have far less input than PARC has had in the progress of the litigation. On the other hand, when the requisites of Rule 23 have been met, the courts and litigants must be protected from finding that, after years of effort and with no warning, finality and uniformity are suddenly impossible to obtain. The purposes of the class action would be thwarted and its mechanisms rendered ineffectual were those who stood to benefit from a class action lawsuit able to sit on the sidelines, letting others present their case, only to call off the deal at the last moment should the apparent outcome not be precisely to their liking.[19] Thus, the same class action parameters and prerequisites that safeguard the rights of class representatives and nonparticipating class members also serve the interests of the courts. Therefore, the proper focus for our present inquiry is not so much the timeliness of PARC's objections, but rather the stated criteria for maintenance of class actions under Rule 23.

Against this background, we turn to the question whether in this case the requisites of Rule 23 are fulfilled in this case for a class consisting of both mentally ill and mentally retarded institutionalized patients. A class action is proper when all the requirements of Rule 23(a) are met and when

---

18. Notice to class members is required only for class actions constituted under Fed.R.Civ.P. 23(b)(3). Fed.R.Civ.P. 23(c)(2). The present litigation is conducted pursuant to Rule 23(b)(2)—or, arguably, Rule 23(b)(1). *See* note 19 *infra* & accompanying text. Although a court *may* require notice under (b)(1) or (b)(2) class actions, *see* Fed.R.Civ.P. 23(d)(2), such notice is discretionary. PARC, of course, has been on notice, and has been a behind-the-scenes participant, from the outset. *See* note 7 *supra.*

19. Although individuals or groups that might be included within a class description may opt out of a class action formed under Rule 23(b)(3), class members do not have that right in actions certified under Rule 23(b)(1) or (2). *See* Fed.R.Civ.P. 23(c)(3). Since this action is not certified under 23(b)(3), *see* note 19 *infra* & accompanying text, a determination that the class is properly constituted under 23(a) and either 23(b)(1) or (b)(2) will bind all those who are within the class description of "all persons who have been or may be hospitalized in state institutions for the mentally ill and/or mentally retarded at any time since July 11, 1974."

one of the Rule 23(b) sections are satisfied. All parties in this case agree that the applicable rule is 23(b)(2).[20] Since the numerosity requirement of 23(a)(1) is not contested, PARC's position apparently is that the certified class fails to fulfill one or more of the other prerequisites.

### B. Commonality of Questions of Law and Fact: 23(a)(2)

■ It is elemental that the existence of common questions of law and fact is implicit in a finding that the party opposing the class acted or refused to act on grounds generally applicable to the class. *See* 3B Moore's Federal Practice § 23.06–1, at 23–301 (1976). So phrased, this requisite is the definition of a 23(b)(2) class action, and is unquestionably met here. Therefore, both 23(a)(2) and 23(b)(2) are at once satisfied.

■ The plaintiffs sued those state and institutional officials who, pursuant to state law (§ 424) and policies, were depriving them, in violation of the due process and equal protection clauses, of their right to handle their own affairs. *See Vecchione I.* These laws and policies affected equally *both* the mentally ill and the retarded. They were enforced in the same way against both groups. Revenue Agents acted in the same way at all institutions. Ad-

ditionally, the record amply reflects that there are retarded people who are competent (and who were so found by the preliminary determination). To exclude them from the class would deprive them of the substantial benefits of *Vecchione I,* including the right to handle their own affairs, and would return them precipitously to the § 424 procedures which we struck down in *Vecchione I.* After the 1974 and 1975 orders, the named plaintiffs in the amended and supplemental complaints alleged that the retarded and the mentally ill continued to suffer from a system that affected them both. The *Vecchione* litigation has always centered not on whether a person is "retarded," "mentally ill," or both, but on the constitutionality of the state's statutory system respecting the manner in which the funds of mental patients are handled. *Vecchione I's* finding of the unconstitutionality of § 424 relates to the statute; that finding cannot be parsed into discrete segments affecting either the mentally retarded or the mentally ill alone. Thus, Rule 23(a)(2) common questions are universally found where mental health statutes are challenged on constitutional grounds. *Goldy v. Beal,* 429 F.Supp. 640 (M.D.Pa.1976) (invalidating civil commitment provision of the Pennsylvania 1966 mental health/mental retardation

**20.** The factual background to this case, *see* Part I *supra,* makes it self-evident that at the inception of the litigation a class action under 23(b)(2) was appropriate, for the very gravamen of the complaint was that the state was acting unconstitutionally "on grounds generally applicable to the class, thereby making appropriate final injunctive relief . . . with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). Therefore, we find the action maintainable under 23(b)(2). *See* Part III.B. *infra.* The action would seem to be maintainable under 23(b)(1) also, which is designed to avoid risks of separate adjudications either to the party opposing the class, (b)(1)(A), or to the individual members of the class, (b)(1)(B). The state cannot be expected to develop and institute unique sets of procedures for each institutionalized patient who brings suit challenging the established state practice. Therefore, as a practical matter, all residents of state mental *institutions would be subject to the money management procedures resulting from this litigation,* or at least would find it substantially more difficult to successfully assert contrary

interests. *Cf. Snyder v. Board of Trustees,* 286 F.Supp. 927 (N.D.Ill.1968) (class action seeking injunction restraining enforcement of statute limiting permissible speakers at state university, apparently certified under 23(b)(1)(B)); *Denny v. Health and Social Services Board,* 285 F.Supp. 526 (E.D.Wis.1968) (class action seeking injunction restraining state from enforcing welfare residency requirement certified under 23(b)(1)(B)). It is not unusual for class actions to span several categories and to be maintainable under more than one section of 23(b). *See generally* 3B Moore's Federal Practice ¶ 23.-35[1] (1976). Whether the class be certified under 23(b)(1) or 23(b)(2), however, is of no practical consequence for the conduct or effect of the litigation. Res judicata and notice matters, peculiar under 23(b)(3), *see* notes 17 & 18 *supra; see generally* 3B Moore's Federal Practice ¶ 23.45 (1976), are common to 23(b)(1) and 23(b)(2). Since the considerations we weigh and the results we reach would be the same under either 23(b)(1) or 23(b)(2), we do not think that the label we choose to apply is of great moment.

law); *Meisel v. Kremens,* 405 F.Supp. 1253 (E.D.Pa.1975) (invalidating Pennsylvania summary revocation of mental patient parole statute; no challenge to class including both retarded and mentally ill under the 1966 mental health/mental retardation statute); *Rakes v. Coleman,* 318 F.Supp. 181 (E.D.Va.1970) (civil commitment statute); *Anderson v. Solomon,* 315 F.Supp. 1192 (D.Md.1970) (mental commitment procedures); *Dixon v. Attorney General,* 313 F.Supp. 653 (M.D.Pa.1970) (2 doctor certification commitment procedure under Pennsylvania 1966 mental health/mental retardation law).

We recognize, of course, that what is before us at this stage of the litigation is a proposed settlement, the effect of which is different from that of a purely negative injunction in that it creates an affirmative program and procedural mechanism to resolve the needs of the plaintiff class. Nor have we lost sight of the asserted differences that exist between the mentally ill and the mentally retarded, which PARC argues relate directly to the effect the proposed settlement will have on the two groups; we shall address these differences as they impact on questions of typicality, 23(a)(3), and, most importantly, adequacy of representation, 23(a)(4). We do not, however, think that either the affirmative nature of the proposed settlement or the cited differences between the mentally ill and the mentally retarded alter the fact that, as to the state's procedures for handling the monies of patients in state mental institutions, there are common questions of law and fact between the retarded and the mentally ill for the purposes of both the litigation and the settlement.

#### C. *Typicality of Claims of the Representative Parties: 23(a)(3)*

This requirement remains the most cryptic of the Rule 23 requirements. Many do not deem it to be a discrete requirement at all, but rather one that partakes of elements in common with other of the 23(a) requirements. *See, e. g., Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181, 1189 (10th Cir.

1975) (quoting 3B Moore's Federal Practice ¶ 23.06–2, at 23–325 (1976): "[In fact, there is no need for this clause,] since all meanings attributable to it duplicate requirements prescribed by other provisions in Rule 23."). For example, the "typicality" requirement is often equated with the 23(a)(2) "common questions" issue discussed immediately above. *See, e. g., Rakes v. Coleman,* 318 F.Supp. 181 (E.D.Va.1970) (commitment statute); *Mersay v. First Republic Corp.,* 43 F.R.D. 465 (S.D.N.Y.1968) (where defendants engaged in scheme common to all class members, "typicality" is satisfied). And it has further been posited as overlapping with adequacy of representation, *see Dolgow v. Anderson,* 43 F.R.D. 472 (E.D.N.Y.1968), or at least with one or more of the elements usually considered in the context of the adequacy requirement. Thus, courts have considered the typicality requirement to relate to similarity of interests, *American Finance Systems, Inc. v. Harlow,* 65 F.R.D. 94 (D.Md.1974); *In re Four Seasons Securities Laws Litigation,* 59 F.R.D. 667 (W.D.Okla.1973), *rev'd on other grounds,* 502 F.2d 834 (10th Cir. 1974) (identity of interests not required; varying fact patterns can support class claims), or, alternatively, to a lack of adverse interests, *Minnesota v. U. S. Steel Corp.,* 44 F.R.D. 559 (D.Minn.1968), both of which are often elements in a determination of adequacy of representation. *See* Part III.D. *infra.*

However the typicality requirement is conceptualized, we think the typicality of the claims of the class representatives to the class claims is clear. The fact that some members of the class might object to the settlement or the possibility of being subjected to a state court guardianship proceeding does not affect the validity of the underlying class definition. " 'Typicalness' is not a subjective test, authorizing a judge to dismiss a class action based on a substantial legal claim where he thinks some members of the class may prefer to leave the violation of their rights unremedied." 3B Moore's Federal Practice ¶ 23.-06–2, at 23–327 (1976). The claims of the named plaintiffs are on their face of a type

with all institutionalized retarded persons, and PARC has given us no concrete data to the contrary.

PARC's argument basically is that the claims of the mentally ill are not typical of the claims of the mentally retarded. For the reasons set out in Part III.B *supra* and developed further in Part III.D. *infra,* we are satisfied that the claims of the mentally ill are sufficiently typical of the claims of the mentally retarded in the particular context of the litigation to satisfy 23(a)(3). Moreover, one of the named plaintiffs is Linda Taub, an institutionalized retarded person who is subject to the possibility of state controlled asset supervision. Thus, the retarded *are* represented by a named plaintiff. PARC's objections do not at all shed light on whether or why the claims of *this* named retarded plaintiff are not typical of the class as a whole. We disavow the sort of speculative determinations of subjective atypicality found in some cases, *see, e. g., Ihrke v. Northern States Power Co.,* 459 F.2d 566, 572–73 (8th Cir.), *vacated with instructions to dismiss as moot,* 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972); *Ward v. Luttrell,* 292 F.Supp. 165, 158 (E.D.La. 1968), and instead find instructive such cases as that in which two expelled high school students filed a civil rights class action on behalf of all secondary school students in the district. The court upheld the class, stating:

> Defendants contend that this designation is not proper under Rule 23 because the majority of Houston secondary students are not in sympathy with the views of methods of these plaintiffs and are, therefore, not "similarly situated." This contention misses the point. All of the members of this class are subject to the same regulations of the Houston School District which have been alleged to be unconstitutional on their face and as applied. It is irrelevant to speculate how many students might need to invoke the first amendment as protection from official sanctions; the fact that each member is subject to the same specific sort of deprivation of constitutional rights as the

representative parties is enough. This case is clearly maintainable as a class action pursuant to Sections (a) and (b)(2) of Rule 23.

*Sullivan v. Houston Independent School District,* 307 F.Supp. 1328, 1337–38 (S.D. Tex.1969). *See also Norwalk CORE v. Norwalk Redev. Agency,* 395 F.2d 920, 939 (2d Cir. 1968); *Cottrell v. Virginia Elec. & Power Co.,* 62 F.R.D. 516, 520–21 (E.D.Va.1974); *Snyder v. Board of Trustees,* 286 F.Supp. 927, 931 (N.D.Ill.1968).

D. *Adequacy of Representation: 23(a)(4)*

The requirement of adequacy of representation demands that, before one is bound by the res judicata effects of a class action, that person must be fairly represented in the action that will adjudicate his rights and interests. As such, it is a basic due process requirement. Thus, it is not an essentially quantitative matter—the number of named representatives in relation to the size of the class—but a qualitative one. Several related questions, in some degree repetitive of questions posed by other of Rule 23(a)'s prerequisites to class certifications, are raised by the adequacy of representation requirement. *See generally* 3B Moore's Federal Practice ¶ 23.07–.07[4] (1976). Do the class representatives have any conflicts of interest with the class they purport to represent? Is the stake of the class representative in the outcome of the suit so minimal or attenuated that the interests of the class may not be prosecuted with sufficient vigor? Are the particular claims of the class representatives so different from those of the class as a whole that even vigorous prosecution of the individual claims might not adequately promote the interests of the class? Is the diligence or competence of plaintiffs' counsel insufficient to protect the interests of the class? Insofar as these questions go to the issue of competence and diligence in prosecuting the interests actually asserted by the class representatives, we need only note that the "vigorousness" of the representation of the present class representatives by exceptionally able and diligent plaintiffs' counsel is not questioned and could not be, as the long

history of this case, here, in the Court of Appeals, and in the Supreme Court demonstrates. The only remaining question, then, is whether interests of the named plaintiffs are dissimilar or antagonistic to those of other members of the class such that they might render the representation by the named plaintiffs suspect. In that case, although the interests of the named plaintiffs may have been vigorously prosecuted, the interests of the class may not have been.

The only manner in which PARC alleges any dissimilar or antagonistic interests, *see* Part III.C. *supra,* between the class representatives and those for whom PARC purports to speak is the interest in avoiding the "stigma" of state guardianship proceedings and in establishing an experimental agent system for handling the funds of institutionalized mental patients—or at least the funds of the mentally retarded—in lieu of guardianship. We find PARC's assertion of dissimilarity of interests on this point insufficient to warrant splitting the class.

In the first place, we have no doubt that the mentally ill and the mentally retarded have shared and continue to share the same interests in this litigation. It cannot be gainsaid that attributes of the mentally retarded differ from those of the mentally ill in a number of respects; that, however, does not mean that as to the issues in this litigation those differences should compel exclusion of the retarded from the class and the benefits of the settlement. Looking at the history of the case in its chronological stages, the 1973 complaint alleged the invalidity of state laws (§ 424) and practices; both groups (retarded and mentally ill) shared the same interest in nullifying those laws that offended due process and equal protection. In 1975, both shared an interest in regaining the $9.1 million taken illegally and in obtaining an appropriate due process substitute to satisfy their legal and material needs. On the amended complaint, both groups share an interest in securing a speedy and just end to the litigation that will assure that the rights found to exist in 1975 are not violated by state officials.

PARC argues, however, that although both groups might share an interest in securing a speedy and just end to the litigation, the question of what is a "just" end receives different answers from the two groups. That is, even assuming the unconstitutionality of the original state law and procedures, PARC is not in accord with the positive relief in the form of the particular procedures that will be mandated by the proposed settlement. Yet we are not told what interest of the retarded is implicated in any significantly different way from the interests of the mentally ill. Although there is no substantial dispute that there is some incremental stigma imposed on those who already have been stigmatized by institutionalization when they subsequently are visited by guardianship proceedings, it is not the class definition that causes the alleged harm, but the relief agreed upon. Surely the mentally ill are no more amenable to the "stigma" of guardianship proceedings than are the mentally retarded; the stigma of guardianship depends much more on fact of incompetency than on the cause of it. PARC argues that the retarded often are institutionalized for longer periods of time than are the mentally ill and that therefore the exposure of the mentally retarded to stigmatizing guardianship proceedings is greater than is that of the mentally ill because, under the new regulations, even the preliminary determinations of competency cannot be formulated sooner than 30 days after admission to a mental institution, ¶ 2.13, and payments for care and maintenance—the state's motivation for seeking guardianship—may not be made from the ward's assets during the first six months following the appointment of a guardian, ¶ 3.5.

Conceding this increased exposure to guardianship proceedings, we do not find this slight difference to be compelling. Having viewed the representation provided by the named plaintiffs and their counsel for the past several years, we are well satisfied that the potentially lesser exposure of the mentally ill has not at all affected the vigor of their representation vis-à-vis

institutionalized patients who are mentally retarded. The asserted difference between the two groups hardly makes the interests of the mentally ill dissimilar or antagonistic to those of the mentally retarded, for the mentally ill are themselves significantly exposed to the possibility of guardianship proceedings. Thus, there can be no question about the named plaintiffs' devotion to the cause of their counsel's access to and comprehension of the realities of the situation.[21] Indeed, it is important to bear in mind that the two categories are not at all mutually exclusive; mentally retarded persons can be, and not infrequently are, mentally ill also.[22]

Additionally, we reiterate that it is apparent that the benefits conferred upon the retarded by the proposed settlement are very substantial and far outweigh the small incremental stigma. *See* Part II *supra.* For, *inter alia,* the settlement eradicates the evils of § 424; it deters the filing of unfounded petitions; it assures a full judicial determination of incompetency; it puts great limits on the guardian officers when the guardian is a state employee (limits far beyond those placed on the typical court-appointed guardian); and it provides great benefits to competent institutionalized residents in the form of assistance in handling their affairs—exactly the sort of functions PARC would seem to support. In all this, it is essential to bear in mind that the needs of "incompetent" people are the same, whether their incompetence arises from mental retardation, mental illness, or any other cause. Thus, it is appropriate to have relief which provides for those needs, without unjustifiable distinctions based on their cause.

All of the foregoing, of course, addresses the question whether, because of asserted diverse interests, the mentally ill would be adequate representatives in this case of the mentally retarded in a broad class certified as institutionalized mental patients. That is how PARC framed its objection. For the reasons we have just set out, we think that PARC has failed to show that as to the very particular issues of this case the mentally ill cannot properly represent all institutionalized mental patients. The differences that exist between the two groups do not affect the adequacy of representation because they either do not significantly impact on the particular subject matter of this case or can be accommodated in the implementation of the settlement or in hearings in state courts.[23]

Also important to our final decision not to fracture the class, however, is the fact, already observed in several contexts, that the retarded do not in this litigation depend for their representation solely on the mentally ill, but in fact *are* specifically represented by a particular named plaintiff—Linda Taub—who belongs to the alleged subclass for which PARC claims to speak. None of PARC's objections to the settlement address the issue of why Linda Taub's representation of the mentally retarded should be considered in any way suspect. She is represented by the same attorneys that represent the mentally ill plaintiffs,

---

**21.** We observe in this regard that one of plaintiffs' counsel in this case, David Ferleger, Esquire, also ably and vigorously represented retarded citizens in their class action suit challenging the conditions of their institutionalization in the celebrated *Pennhurst* case, *Halderman v. Pennhurst State School & Hospital,* 446 F.Supp. 1295 (E.D.Pa.1977).

**22.** Of course, PARC's intent was probably to object on behalf of all mentally retarded persons, whether or not they are also mentally ill, as distinguished from those who are mentally ill only. Nevertheless, we think that the point is valid that the interests vital to this litigation are shared between the two groups and are not so distinct as PARC makes them out to be.

**23.** We thus have not shunned the teaching of *Kremens v. Bartley,* 431 U.S. 119, 97 S.Ct. 1709, 1718, 52 L.Ed.2d 184 (1977) that "careful attention be paid to the differences between [the] mentally ill and mentally retarded." See also Institutionalized Juveniles in Pennsylvania Institutions for the Mentally Ill and Mentally Retarded, namely *Kevin S., et al. v. Secretary of Public Welfare, et al.,* 459 F.Supp. 30 (E.D. Pa.1978), where a three-judge court, on remand from *Kremens v. Bartley,* maintained a class consisting of both mentally ill and mentally retarded persons, finding no significant difference between the two groups for due process purposes.

but our experience with this case and with counsel convinces us that there is no ground for any allegation of conflict of interest or that any disadvantage to Ms. Taub in particular or the retarded in general has resulted from this joint representation. Nor is this a case in which the objector has demonstrated that the self-proclaimed class representative actually represents the asserted interests of only a small minority of the class. *See, e. g., Peterson v. Oklahoma City Housing Authority,* 545 F.2d 1270 (10th Cir. 1976) (inadequate representation where 811 of the 830 members of the class did not support suit); *Bailey v. Ryan Stevedoring Co.,* 528 F.2d 551 (5th Cir. 1976) (voluntary petition indicated majority of class did not support suit); *Schy v. Susquehanna Corp.,* 419 F.2d 1112 (7th Cir. 1970) (when over 80 percent of stockholders with full notice of stockholder's suit to prevent merger voted in favor of the merger, plaintiff shareholder was inadequate class representative). Thus, even were we to agree with PARC that the interests of the retarded and the mentally ill might be sufficiently divergent to require discrete representation to protect both sets of interests, we would not have received from PARC adequate justification to fracture the class at this point. Both sets of interests *are* adequately represented.

The discrete representation of the mentally retarded within the plaintiff class would make it highly improper for us arbitrarily to split, under Fed.R.Civ.P. 23(c)(4), the class and the remedies obtained by the proposed settlement. Such action would leave the retarded, under PARC's unquestionably able leadership, free to work out their own settlement with the Commonwealth on terms that they think might be more favorable.[24] In some cases, when discrete interests appear that require independent representation, it is entirely appropriate to·split classes into subclasses. Here,

however the unities of interest far exceed the asserted differences, and it is apparently the view of those whose function it is to safeguard the interests of Ms. Taub that those interests are best protected by joining hands with the mentally ill in an effort to reach, with the Commonwealth, an arrangement acceptable to all.[25] Granting PARC's representation of the retarded might well deny that of Ms. Taub. We may not substitute PARC's policy preferences for those of the named plaintiffs absent a showing that the plaintiffs are not, in fact, representative of the class. As an initial matter, we are and have been satisfied that these named plaintiffs adequately represent the class; PARC has presented arguments, but has not persuasively demonstrated the contrary. On this record, we do not think that the interests of justice would be served by stripping the retarded of the very substantial benefits of the settlement.

### E. *Conclusion*

If PARC were successful in its motion to exclude the retarded from the class it would radically change the course and result of this litigation.. We do not gainsay that our main personal focus during the initial phase of the litigation was on the plight of the mentally ill rather than the mentally retarded. This was largely because the psychiatrists who testified in *Vecchione I* were discussing the ability of mentally ill patients to handle their own funds. Perhaps we were then unconsciously assuming that most moderately or severely retarded patients could not handle their own funds, and were not focusing upon the notions of competency advanced by PARC at the hearing on the proposed settlement (*i. e.* that competency is as much a function of ability to make and communicate choices regarding the utilization of monies as it is of mechani-

24. Query, however, whether, given the variegated nature of the problems of the retarded, some of whom require *Vecchione* guardians and some of whom do not, PARC can lay any greater claim to their sole representation than can the present class representatives.

25. Moreover, were we to have certified a subclass of retarded persons represented by Ms. Taub—as would likely have been the case, since at the time of class certification no other class representatives had been proposed by any interested party—the end result would have been the same.

cal ability to handle monies).[26] However, we certainly were not unaware that a number of retarded persons would be assuming control of their own funds as the result of the *Vecchione I* decree, and we were acutely aware that the due process and equal protection defects in § 424 needed to be eradicated for the benefit of the mentally retarded as well as the mentally ill. And, as the record reflects, plaintiffs' counsel were finely attuned to the impact on the retarded of *Vecchione I* (and *II*).

Moreover, as PARC's own proof has shown, there are many identities of interests between the retarded and mentally ill. There are many competent persons in both groups who can benefit from *Vecchione I*. All persons in both groups will benefit from the due process and equal protection structures of *Vecchione I*. Many persons in both groups would require guardians even if a system of agents were available. The proposed settlement protects the rights of both groups, and allows for challenges in state court to preliminary determinations by defendants of a patient's incompetence. The alleged antagonisms are, for the most part, nonexistent. To the extent they exist they are far outweighed by the unities of interest. Disallowing the class definition previously ordered would result in a chaotic system in which the retarded would suffer from the unconstitutional pre-1975 procedures. The motion to alter or amend will therefore be denied. For the reasons previously stated the settlement will be approved.

An appropriate order follows.

### APPENDIX

### STIPULATION OF COUNSEL

This document is in three parts. Part I is an introduction stating the background of facts, circumstances and conditions which form the basis for the succeeding parts. Part II consists of the basic elements of the agreements of the parties to which they intend to be bound. Part III consists of the establishing of regulations of a new autonomous Central Guardians Office in the Department of Public Welfare.

### Part I

1. This protracted litigation involving the system in Pennsylvania of control and management of the funds and property in institutions for the mentally ill and the mentally retarded has resulted in a situation of uncertainty for all the parties. Various "interim" systems have been implemented, amended and discontinued.

2. Pending against the defendants are the plaintiffs' various motions for criminal and civil contempt, which were scheduled for hearing in the midst of the negotiation which has ultimately produced this document. Also pending are plaintiffs' amended and supplemental complaint and the defendants' motion for judgment on the pleadings with regard to that document.

3. The plaintiffs have sought a guardian office totally independent from the Department of Public Welfare; the defendants have resisted this and, after consultation with the Governor's Office and the heads of other departments, have concluded that such an independent office cannot be created at this time.

4. The defendants resigned and were thereafter enjoined by this Court from resigning as representative payees for those members of the class who are federal beneficiaries.

5. All parties desire to bring an end to this litigation which will produce a workable money management system for residents of Pennsylvania institutions, one which will not violate the constitutional rights of those residents.

6. In recognition of the above, and after intensive discussion and negotiation, the parties have agreed to settle and compromise their various claims, defenses and interests. The defendants have agreed not to

---

26. We should note, however, that there were three judges on the *Vecchione I* panel, not just one.

resign as representative payee and the plaintiffs have agreed to forego all actions for contempt arising out of this litigation thus far. Should the defendants' intentions change, they shall notify the plaintiffs' counsel and the Court of their intentions. This document embodies that settlement.

*Part II*

*Section A*

*Introduction*

1. The requirements stated below in this Section of Part II shall be fully adopted by the Secretary of Public Welfare, Frank S. Beal, on behalf of the Department of Public Welfare and shall be published as immediately effective in the Pennsylvania Bulletin within twenty (20) days of the approval of this stipulation. These requirements shall repeal and replace regulations published on April 19, 1975 in the Pennsylvania Bulletin, 5 Pa.Bull. 931 (1975), pursuant to prior agreement and Order of April 4, 1975 entered in the case of *Vecchione v. Wohlgemuth*, C.A.No. 73–162 (E.D.Pa.).

*Section 424 Not to be Utilized*

2. Section 424 of the Mental Health and Mental Retardation Act, 50 P.S. § 4424, shall no longer be utilized or enforced in any manner whatsoever.

*No Deprivation of Property Without Court Authorization*

3. The Director, Revenue Agent and other officials and employees of each state mental hospital, center or any annex of such facilities shall not deprive any patient/resident of custody of his or her personal property or interfere with such custody, unless and until such person is determined to be incompetent under the Probates, Estates and Fiduciary Code of 1972 and these facilities or persons are so authorized by the appropriate court.

3a. Nothing in the above paragraph shall be applicable to recipients of Supplemental Security Income (SSI), whose benefits shall be handled by the Guardian Officers appointed as representative payee under Federal law. SSI benefits shall not be considered available assets or income for the purposes of assessing liability for care and maintenance. No disbursements from SSI benefits can be made for care and maintenance.

3b. Notwithstanding the provision of Paragraph 3 above, the Guardian Officer shall be authorized to accept, from a benefit-issuing agency, appointment as representative payee for a period not to exceed six (6) months, provided the petition required by Paragraph 3 is promptly filed. No disbursements shall be made for care and maintenance pending full compliance with Paragraph 3.

3c. The Guardian Officer shall accept payee appointments as described in Paragraphs 3a and b upon certification from the benefit-issuing agency that acceptable non-institutional payees, such as family, friends, and interested associations (e. g. PARC and mental health associations) are not available.

*Non-Custodial Assistance With Property Management*

4. The social services staff of each state mental hospital, center or any annex of such facilities shall advise each patient/resident who has not been declared incompetent by a court of appropriate jurisdiction, orally and in writing, upon admission and for the first three months thereafter, that the said staff will be available to assist him or her to manage and safeguard his or her property. Each instance and manner of this advice shall be recorded in the patient/resident's medical chart. Such services and assistance shall include, but not be limited to, the following:

a. Providing access to, in person or by agent, and transportation to and from, local banks and savings institutions of each resident's choice; banking by mail shall also be permitted and assisted;

b. Providing for secure interim safekeeping of patient/resident property if the patient/resident so desires.

*Procedures for Determination of Competence*

5. The Director of each state mental hospital, center or any annex of such facilities shall formulate a preliminary opinion of each patient/resident's competence to manage his or her real and personal property not sooner than thirty days after such resident's admission or commitment. Provided however that such opinion of competence shall not be formulated when the patient/resident has a court-appointed guardian or is under eighteen years of age.

6. The preliminary opinion referred to in Paragraph 5 shall be formulated in the case of a mentally ill person by a psychiatrist and in the case of a mentally retarded person, by a psychologist or psychiatrist. Said opinion shall state in detail the medical and factual bases for the conclusions therein and shall, after approval by the Director, be promptly certified in writing to the Guardian Officer of the facility and a copy shall be given to the patient/resident.

7. If the Director's preliminary opinion is that the patient/resident is not competent to handle his or her real and personal property, or if he or she is under eighteen and has no parent, guardian or next friend, the Guardian Officer shall forthwith refer the matter to the Department of Justice which may institute proceedings under the Probate, Estate and Fiduciary Code of 1972 to have the patient/resident declared incompetent by a court of appropriate jurisdiction. In all cases, preference shall be given to recommending to the court appointment of a Bank or Trust Company willing to accept guardianship appointments.

8. In all cases where a court has appointed a guardian for a patient/resident or where the state institution, or an official or employee thereof, has obtained authorization by an appropriate court to receive, hold or dispose of such person's personal property by virtue of such person's incompetence, the following procedures shall be complied with:

a. The Director, or his or her delegate, shall thereafter review the patient/resident's symptoms, diagnosis, medical record and history to formulate an opinion as to whether the resident remains incompetent. For the mentally ill, this review shall occur every six months. For the mentally retarded, it shall occur annually except for those persons who are severely or profoundly impaired in adaptive behavior as well as intellectual functioning as defined by the American Association on Mental Deficiency (AAMD), for whom reviews shall occur every two years. This review shall be conducted in the manner of the evaluation described in Paragraph 6, above.

b. An opinion that the patient/resident remains incompetent must be documented in the patient/resident's records at each redetermination conducted in accordance with subparagraph a above.

c. In the event that the Director's opinion is that the patient/resident is no longer incompetent, he or she shall promptly institute action in the appropriate court to terminate the adjudication of incompetency.

d. In those cases where the state institution, or an official or employee thereof, has been appointed by a court to manage the person's estate, and the resident remains incompetent, but is ready for discharge as no longer seriously mentally disabled or is to be transferred to another institution, then the Director shall immediately institute an action in the appropriate court for appointment of a private guardian (preferably a bank or trust company) or for another institution or official or employee thereof, to manage the person's estate, whichever is appropriate.

9. Any state institution, employee or official thereof, which has obtained authorization for an appropriate court to receive, hold or dispose of such person's personal property, by virtue of such person's incompetence as aforesaid, shall make no disbursements from the incompetent's estate for his or her care and maintenance in the institution unless, within one year, a full and complete accounting has been filed with the court which includes an affidavit that all available defenses and/or grounds

for abatement, modification, or discharge of liability as set forth in paragraph 12 of this stipulation have been asserted, or that no such grounds exist. In no event shall the institutions make disbursements from, or make claim to any portion, of, the incompetent's estate for care and maintenance for the period of six months from the adjudication of incompetence. Bills accruing during that period of time, however, may be paid after the six month waiting period and after all available defenses have been raised and adjudicated.

*Transition Provisions*

10. Present patient/resident accounts established and controlled by the Guardian Officer may be maintained for a period not to exceed one year from the date of this Stipulation provided that the petition for appointment of guardian, if required, is filed within 6 months.

11. If a guardianship petition is denied by the Court of Common Pleas or is not acted upon within one year, or if the petition is not filed within 6 months, the Guardian Officer shall promptly contact the benefit-issuing agency or entity concerning the disposition of conserved funds. The Guardian Officer shall also notify the agency or entity that subsequent benefit checks cannot be accepted and will be returned if received. If no direction is received from the agency or entity within 30 days of the date of the decision denying the petition or the expiration of the six month period for filing, or one year period for court action, conserved funds shall be returned to the patient/resident.

*Billing Procedures*

12. The Commonwealth agrees that patient/residents who have not been declared incompetent by a court of appropriate jurisdiction and who are receiving care and maintenance in state institutions shall be billed for the costs of such care and maintenance chargeable to them under Section 501 of the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4501, as assessed by the Revenue Agent of each state institution, such billing to be in the same manner that any in-patient not suffering mental disability, in any public or private hospital, would be billed for the costs thereof, except:

a. The bill and all correspondence relating thereto must be accompanied by easily comprehensible notice, in English, and Spanish where appropriate, advising the patient/resident of his or her right to seek counsel from an attorney or lay person of his or her choice, provided, however, that such counselor not also be an employee of the Commonwealth, and advising him or her of the right to the presence of counsel in any conferences with the Revenue Agent or any other Commonwealth employee with respect to settlement of the bill, and advising him or her of the right to confer with the Revenue Agent and to petition the Secretary under 50 P.S. § 4606 and to obtain a hearing regarding abatement, modification or discharge of assessed liability on the basis that:

(i) Imposition of liability would result in loss of financial payments of benefits from any public or private source of which he or she might be entitled, 50 P.S. § 4504(a)(1)(i), or

(ii) Imposition of liability would result in a substantial financial hardship upon him, her or a person owing a legal duty of support to him or her, 50 P.S. § 4504(a)(1)(ii), or

(iii) Imposition of liability would result in greater financial burden upon the people of the Commonwealth, 50 P.S. § 4504(a)(1)(iii), or

(iv) Imposition of liability would result in a financial burden upon him or her that would nullify the results of care and treatment for mental disability, 50 P.S. § 4505(a)(1)(iv), or

(v) Social Security OASDI benefits are, and other federal or state benefits may be insulated from claims of the Commonwealth for care and maintenance by statute 42 U.S.C. § 407, or

(vi) The patient/resident is entitled to the reasonable value of unpaid work benefitting the Commonwealth in reduced costs

of maintenance and operation of the facility to which he or she was admitted, performed by him or her, by way of offset, or

(vii) The care and maintenance is less than that assessed by the Commonwealth, or

(viii) Any other defenses or offsetting claims in law and equity.

(b) Upon a determination by the Commonwealth Court or Supreme Court of Pennsylvania involving grounds 12(a) (v-viii), either party may seek modification of these provisions.

*Confidentiality and Proper Treatment*

13. The Guardian Office shall conduct all financial dealings with the patient/resident and/or his or her counsel as confidential, and shall not divulge the nature and contents of such dealings to any institutional officers, agents, or other persons charged with provision of care and maintenance of such patient/resident, without his or her consent or knowing, intelligent and voluntary waiver of his or her right to confidentiality, and in no event shall patients/residents seeking modification, abatement or discharge of assessment of the Commonwealth, receive care, treatment and maintenance in any manner different from that received by other patients/residents.

*Failure to Pay*

14. In the event that a patient/resident fails to voluntarily pay his or her bill, whether following a conference with the Revenue Agent or otherwise, no state official or employee will in any way interfere with the patient/residents' possession, use, and control of his or her property excepting execution of a judgment by a court of appropriate jurisdiction against him or her for the costs of care and maintenance, following full and fair hearing, wherein the patient/resident, if incompetent, is represented by guardian *ad litem*. It is further agreed that the assessment of the Revenue Agent, following conference or otherwise, shall be, except for errors in computation, the limit of the patient's/resident's liability for the period of care and maintenance for which judgment is sought.

*Part II*

*Section B*

1. Nothing in this stipulation shall bar the subsequent transfer by action of the Executive branch of the powers, duties and responsibilities of the Guardian Office from the Department of Public Welfare to another department, board or agency of the state government, provided that all counsel for the plaintiffs be given ninety days advance notice of such proposed action.

2. The parties recognize that the negotiations preceding this agreement have been ongoing for 2½ years, and that the delay in the negotiations has principally been the result of the defendants' contesting the original *Vecchione* decree; the parties agree that these circumstances have resulted in delay on the part of potential claimants in presenting their claims. The defendants, their officers and agents hereby agree not to raise or otherwise assert any time defenses and bars, including the Statute of Limitations, which might be applicable to any individual claims for out-of-pocket expenses or losses, including those brought before the Board of Finance and Revenue, including, for example, an overpayment for the cost of care and maintenance in a state institution alleged to have resulted from violations of earlier orders or decrees in this case. See *Coshey v. Beal,* 366 A.2d 1202 (Comm.Ct. 1976).

3. Except as noted in Paragraph 2 immediately above, the Commonwealth, its officials, its employees and agents, including the defendants in this case, are hereby released from any liability for compensatory or punitive damages, civil or criminal contempt, for any acts prior to the date of this document.

4. Pursuant to Rule 23(e), F.R.C.P., notice of the proposed settlement of this litigation shall be given to the class of plaintiffs by the Department of Public Welfare by (1) causing an advertisement in the form set out in Exhibit A to be placed in one daily newspaper of general circulation in

each county of the Commonwealth, which advertisement shall appear for five days, including Sunday, (twice only for a non-daily publication), and shall be at least ⅛ of a page in size, and (2) by causing a notice in the form set out in Exhibit "A" to be posted and maintained conspicuously in all wards and living areas of all state mental health and retardation facilities, and (3) by causing a notice in the form set out in Exhibit "A" to be sent to all county MH/MR Program Administrators with a request that the notice be made available to directors of community mental health centers and base service units for all persons who may be affected hereby, and (4) by causing a notice in the form set out in Exhibit "A" to be sent to all statewide mental health and mental retardation community groups.

5. The defendants shall report to this Court and to the plaintiffs in 60, 120, and 180 days on the progress in implementation of this document, and shall submit a final report in 240 days, certifying and documenting their full compliance. These reports shall designate the person or persons responsible for their drafting and preparation.

6. The Court shall retain jurisdiction of this matter to assure compliance and implementation of this document by the defendants, and to rule upon plaintiff's Motion for Attorneys' Fees.

7. Violations of the terms, duties and responsibilities imposed by this document shall be punishable by contempt, and, after hearing, subject contemnors to fine or other sanctions.

8. The defendants' counsel hereby certify that defendant Frank Beal and the Attorney General have personally authorized this Stipulation.

*Part III*

1. The regulations below shall be fully adopted by the Secretary of the Department of Public Welfare, Frank Beal, on behalf of the DPW, and shall be published as immediately effective in the Pennsylvania Bulletin within twenty (20) days of approval by this Court. These regulations,

Part III of the settlement of the *Vecchione* litigation, may be amended by the Department in the future, with the exception of those sections (i. e., 1.0, 2.13, 2.21–2.25, 3.5, 3.6–3.8, 4.2, 5.1–5.2, 5.51–5.54) incorporated into Part II, Section A above. Such amendment may occur only after sixty days advance notice by the Secretary of Public Welfare to the Court and the plaintiffs of the intention to amend.

1.0 General

Each mental health hospital and state center shall have an autonomous office known as the Guardian Office with the authority to implement and administer a system of patient money management. The Guardian Officer shall serve as a court-appointed guardian and representative payee for incompetent patients and residents and shall, with their consent, assist competent clients in managing their funds.

It shall be the Guardian Offices' responsibility to insure that the financial affairs of clients for whom the officer has been appointed guardian or is serving as representative payee are managed in the client's best interests.

Fiscal management on behalf of clients shall view the total of the client's financial needs and obligations, both immediate and long-range, including the need for assets and income with regard to and after discharge from the facility. The Guardian Office at all times has the obligation to preserve the clients' funds by attempting to reduce or eliminate the amount of the clients' liability. The Guardian Officer is, however, authorized and required to pay debts and obligations determined in accordance with the law.

The interests or concerns of other entities shall not be permitted to influence the discharge of these duties.

It shall be the Guardian Offices' responsibility to act as fiscal advocate on behalf of the client and to act to protect the legal rights of the client in fiscal matters. Where any reasonable grounds exist, the Guardian Office shall request abatement, modification, or discharge of the client's

assessed liability on the grounds specified below.

The Guardian Officer shall neither seek nor accept appointment as guardian of the person and shall not make treatment decisions or be involved with them other than to determine whether the expenditure of funds in accordance with the treatment plan is in the patient's best interest.

1.1 Staffing and General Responsibility

1.11 The institutional Guardian Office shall be staffed with a Guardian Officer and such other personnel as may be required to assist the Guardian Officer in carrying out the responsibilities outlined below. The staff of the Guardian Office are employees of the Department of Public Welfare, subject to these regulations, and are administratively placed under the Deputy Secretary for Social Services, under the supervision of the Director of the Central Office of the guardian. The Deputy Secretary for Social Services reports to the Secretary of Public Welfare.

1.12 There shall be created under the Deputy Secretary of Social Services, an autonomous Central Office of the Guardian. The office will be staffed by a Director and other appropriate staff as necessary and will have access to various support staff within DPW. The Director will provide both policy and operational supervision over the operations of the various Guardian Offices. Independent legal counsel shall be provided for a period of six months by an attorney in the Department of Public Welfare's Office of Legal Counsel. This attorney shall not also have responsibilities in the areas of mental health, mental retardation, or institutional collections.

1.13 Personnel decisions regarding the various Guardian Offices will be made by the Director subject to review by his or her supervisor. All personnel actions will be subject to and made in compliance with the Civil Service Act and the applicable provisions of the existing collective bargaining agreement.

No director, officer, or staff may be suspended or dismissed solely for exercising any authority granted under these regulations.

1.14 The Guardian Office and employees responsible for maintaining client funds shall be familiar with their responsibilities and duties as a guardian/representative payee, with provisions relating to abatement, modification, and discharge of liability as well as all procedures, regulations, and information relating to the handling and maintenance of patient funds. The Director shall provide uniform interpretation of procedures and policies concerning the operation of the Guardian Office as needed.

1.15 The Guardian Officer shall be solely responsible for any misuse or mismanagement of funds for which he is responsible. The Guardian Officer shall insure, establish, and verify that funds are disbursed in accordance with these regulations, and in the best interests of the client.

1.151 Each Guardian Officer shall have on file with the Secretary of the Commonwealth a bond at least equal to the total amount of client money and personal property for which he serves as guardian or payee.

1.16 The Guardian Office shall be open to clients during regular working hours on a basis sufficient to accommodate clients' needs. Provisions shall be made to accommodate emergency situations.

1.17 The institutional staff shall provide full cooperation and assistance to the Guardian Office in all matters related to the discharge of the responsibilities outlined in these regulations.

1.18 The Guardian Officer has and shall exercise advocacy responsibility in the conduct of any activity undertaken on behalf of client which involves the expenditure of client funds.

2.0 Appointment of Guardian or Payee

2.1 Application for Benefits

2.11 Unless the person knowingly objects, the Guardian Officer shall assist patients/residents in applying for any benefits to which they may be entitled, and may make protective applications for benefits when necessary.

2.12 The Guardian Officer shall, if requested by the benefit-issuing agency, arrange for appropriate staff at the institution to provide information to the agency regarding the patient's/resident's ability to manage funds to which he or she may be entitled. The information to be submitted shall be specified by the agency, but shall not be formulated within the first 30 days of institutionalization. The Guardian Officer shall submit this information to the agency.

2.13 If patient/resident is receiving benefits from a benefit-issuing agency or entity upon admission to the institution, a preliminary determination of competency shall be formulated not sooner than 30 days after admission. If the person is preliminarily determined to be incompetent, the Guardian Officer may indicate to the agency or entity the possibility that a payee may be appropriate, and shall indicate his or her availability to serve as payee. If requested by the agency or entity, the Guardian Officer shall proceed as in 2.12 above.

2.2 Acceptance of Payee Appointment

2.21 The Director, Revenue Agent and other officials and employees of each state mental hospital, state center or any annex of such facilities shall not deprive any patient/resident of custody of his or her personal property or interfere with such custody, unless and until such person is determined to be incompetent under the Probates, Estates and Fiduciary Code of 1972 and these facilities or persons are so authorized by the appropriate court.

2.22 Nothing in the above paragraph shall be applicable to recipients of Supplemental Security Income (SSI), whose benefits shall be handled by the Guardian Officers appointed as representative payee under Federal law. SSI benefits shall not be considered available assets or income for the purpose of assessing liability for care and maintenance, and shall not be expended for care and maintenance.

2.23 Notwithstanding the provision of Paragraph 2.21 above, the Guardian Officer shall be authorized to accept, from a benefit-issuing agency, appointment as representative payee for a period not to exceed six (6) months, provided the petition required by paragraph 2.21 is promptly filed. No disbursements shall be made for care and maintenance pending full compliance with Paragraph 2.21.

2.24 The Guardian Officer shall accept payee appointments as described in Sections 2.22 and 2.23 upon certification from the benefit-issuing agency that acceptable non-institutional payees, such as family, friends, and interested associations (e. g., PARC and metal health associations) are not available, and that payment will not be made to the beneficiary directly.

2.25 If a guardianship petition filed under Paragraph 2.21 is denied by the Court of Common Pleas or not acted upon within six months as required by Sections 2.23, the Guardian Officer shall promptly contact the benefit-issuing agency or entity concerning the disposition of conserved funds. The Guardian Officer shall also notify the agency or entity that subsequent benefit checks cannot be accepted and will be returned if received. If no direction to the contrary is received from the agency or entity within 30 days after the date of the decision denying the petitions or the expiration of the six month period, conserved funds shall be returned to the client.

2.26 Nothing in these regulations is intended to prohibit a person not connected with the institution from applying to a Court for appointment as a guardian, or from seeking to terminate the Guardian Officer's appointment as guardian.

2.27 Upon a reasonable request for information on the scheduling of guardianship hearings, the time, date, and location of scheduled hearings, but not the name of the patient/resident involved, will be provided by the responsible attorneys in the Department of Public Welfare's Office of Legal Counsel and the Justice Department's Philadelphia and Pittsburgh Offices.

### 3.0 Powers and Duties as a Court-Appointed Guardian

3.1 As a court-appointed guardian, the Guardian Officer shall act fully in accordance with the Probate, Estates and Fiduciary Code, exercising full powers as a guardian specified therein, and shall also comply with the orders of the Orphans Court having jurisdiction over the patient/resident.

3.2 The Guardian Officer shall have sole authority to expend a patient's/resident's funds in his or her best interest in accordance with state and federal law. The Guardian Officer shall consult with the client to the extent feasible and may also consult with appropriate staff and others to ascertain the patient's/resident's needs. The Guardian Officer shall encourage these persons to bring to his or her attention appropriate purchases to be made for the patient/resident.

3.3 The Guardian Officer may seek and retain outside counsel to represent the interests of the patient/resident on any matters. Free legal services shall be obtained whenever the patient/resident is eligible, such services are available, and the attorney is sufficiently acquainted with the legal questions involved.

3.4 The Guardian Officer shall receive all bills relating to persons for whom he or she serves as guardian or payee.

3.41 Payment of bills for client insurance premiums, union dues, non-institutional medical expenses, and all other personal needs may be made if in the client's best interest, and if the client has sufficient monies in his/her account. If the request for payment is greater than the balance in the client's account, a payment plan may be established in accordance with the client's monthly benefits and the client's needs.

3.5 The Guardian Officer shall have the authority to pay bills for care and maintenance determined due in accordance with applicable law. No payments for care and maintenance may be made during the first six months following the appointment of the Guardian Officer as guardian. Bills accruing during that period may be paid thereafter, after all available defenses have been raised and adjudicated.

3.51 The Guardian Officer shall have the authority to seek and shall, when reasonable grounds exist, seek abatement, modification, or discharge of assessed liability under 50 P.S., §§ 4501 and 4504 and regulations promulgated thereunder, on the basis of grounds set forth below.

3.52 In pursuing abatement, modification, or discharge, the Guardian Officer may seek outside legal assistance to represent the interests of the patient/resident. The Guardian Officer shall obtain such assistance whenever a court hearing on liability is to be requested or held. Free legal services shall be obtained whenever the patient/resident is eligible, such legal services are available, and the attorney is sufficiently acquainted with the legal questions involved.

3.6 Patients and residents who have not been declared incompetent by a court of appropriate jurisdiction receiving care and maintenance in state institutions shall be billed for the costs of such care and maintenance chargeable to them under Section 501 of the Mental Health and Mental Retardation Act of 1966, 50 P.L., § 4501, as assessed by the Revenue Agent of each state institution, such billing to be in the same manner as any patient not suffering mental disability, in any public or private hospital, would be billed for the costs thereof.

3.7 The bill and all correspondence relating thereto must be accompanied by an easily comprehensible notice, in English and Spanish where appropriate, advising the patient of his or her right to seek counsel from an attorney or lay person of his or her choice, provided, however, that such counselor not also be an employee of the Commonwealth, and advising him or her of the right to the presence of counsel in any conferences

with the Revenue Agent or any other Commonwealth employee with respect to settlement of the bill, and advising him or her of the right to confer with the Revenue Agent and to petition the Secretary under 50 P.S., § 4606 and to obtain a hearing regarding abatement, modification or discharge of assessed liability on the basis that:

(i) Imposition of liability would result in loss of financial payments of benefits from any public or private source of which he or she might be entitled, 50 P.S., § 4504(a)(1)(i), or

(ii) Imposition of liability would result in a substantial financial hardship upon him, her or a person owing a legal duty of support to him or her, 50 P.S., § 4504(a)(1)(ii), or

(iii) Imposition of liability would result in greater financial burden upon the people of the Commonwealth, 50 P.S., § 4504(a)(1)(iii), or

(iv) Imposition of liability would result in a financial burden upon him or her that would nullify the results of care and treatment for mental disability, 50 P.S., § 4505(a)(1)(iv), or

(v) Social Security OASDI benefits are, and other federal or state benefits may be insulated from claims of the Commonwealth for care and maintenance by statute 42 U.S.C., § 407, or

(vi) The resident is entitled to the reasonable value of unpaid work benefitting the Commonwealth in reduced costs of maintenance and operation of the facility to which he or she was admitted, performed by him or her, by way of offset, or

(vii) The care and maintenance is less than that assessed by the Commonwealth, or

(viii) Any other defenses or offsetting claims in law and equity.

3.8 Accounting

The Guardian Officer shall at all times maintain current accounting of funds received and disbursed sufficient to meet the requirements of the benefit-issuing agency, Orphans Court, and Common-

wealth of Pennsylvania. The Guardian Officer shall annually submit to the Orphans Court an accounting of income received and disbursements made during the preceding year on behalf of the patient/resident for whom he serves as guardian. The filing shall also include an affidavit by the Guardian Officer that he or she has personally investigated and that either no grounds for abatement, modification, discharge of liability exist, or that grounds exist and the relevant application and appeals have been pursued.

3.9 Accounts with a Bank

3.91 The Guardian Officer shall maintain accounts at a bank covered by the Federal Deposit Insurance Corporation and approved by the State Treasurer. The accounts shall include a checking and savings account. Conserved funds shall, to the extent possible, be placed in a savings account, certificates of deposit, or other FDIC insured accounts.

3.92 Interest earned on accounts shall be periodically allocated to each client's account in direct proportion to the client's account balance at the time the interest is calculated.

4.0 Assistance to Competent Clients and Others in Money Management

4.1 With the written approval of the patient/resident, the Guardian Officer shall assist competent patients/residents in managing their funds. Patients/residents shall be informed of the availability of this assistance.

4.2 Among the services that shall be offered by the Guardian Officer, in conjunction with other institutional employees, are:

Providing access to, in person or by agent, and transportation to and from, local banks and savings institutions of each resident's choice; banking by mail shall also be permitted and assisted; and

Providing for secure interim safekeeping of patient/resident property if the patient/resident so desires.

5.0 Change in Client Status

5.1 Whenever a patient/resident for whom the Guardian Officer serves as a Guardian is determined to be competent in accordance with Section 5.5 below, the Guardian Officer shall request Office of Legal Counsel to petition for removal of the guardianship and shall inform the benefit-issuing agency of the patient's/resident's status.

5.2 Whenever a patient/resident for whom Guardian Officer serves as Guardian transfers to another institution or is discharged, but remains incompetent, the Guardian Officer shall inform the benefit-issuing agency and request the assistance of the Office of Legal Counsel in securing a new guardian or payee as required. Pending formal transfer of the guardianship appointment, the Guardian Officer of the former institution shall cooperate with the Guardian Officer of the new institution to insure that funds are available for the client's needs.

5.3 Death of a Patient/Resident

Upon the death of a patient/resident for whom the Guardian Officer serves as guardian or payee, the Guardian Officer shall:

5.31 Comply with all applicable reimbursements of the Probates, Estates, and Fiduciary Code regarding termination of the guardianship.

5.32 Expend any death benefits in accordance with the rules and regulations of the benefit-issuing agency.

5.33 Return conserved funds to the benefit-issuing agency, if required by the statutes and regulations governing such funds.

5.34 Release all conserved funds (with the exception of those covered by 5.33), together will all outstanding bills, to the executor or administrator of the patient's/resident's estate, if any. Funds may be released upon presentation of letters of administration, a short certificate, or other appropriate and reliable evidence indicating that the person is the legally authorized representative.

5.35 If, within 90 days of the date of death, documentation is not received that a legally authorized representative of the estate has been appointed, escheat proceedings shall be initiated.

5.4 The Superintendent's Office, shall, individually within three days, inform the Guardian Officer of patients who have been discharged, transferred, or died. A monthly report summarizing these actions should also be prepared and submitted.

5.5 Redeterminations of Competency

5.51 The Guardian Officer shall insure that competency redeterminations are made in accordance with these regulations. These redeterminations shall consider whether the patient/resident for whom the Guardian Officer serves as guardian (or payee for SSI recipients) remains incompetent as defined in the Probates, Estates, and Fiduciary Code. The Guardian Office shall, in addition, act to continuously review the status of the client's competency and to seek competency reviews by all appropriate means, so as to terminate the Guardian function as soon as the client is competent.

5.52 For mentally ill patients, a psychiatrist shall review the patient's symptoms, diagnosis, medical records and history every six months to formulate an opinion regarding the patient's competence.

5.53 For mentally retarded persons, a review of competency as in Section 5.52 shall be conducted by a psychologist at the following intervals:

—for those persons who are severely or profoundly impaired in adaptive behavior as well as intellectual functionings as defined by the AAMD, reviews shall occur every two years.

—for all other persons, one year.

5.54 These reviews shall be conducted in the manner of the initial determinations of competency.

6.0 The Director of the Central Office of the Guardian shall seek to establish training programs for social services and other institutional staff regarding

means for encouraging self-dependence and financial competency among patients/residents and, for those who have guardians appointed, programs to alert such staff to regained competency. Vecchione Refund monies not claimed by those entitled to them may be used for this purpose upon approval of the Court. Upon reasonable request, the Department of Public Welfare will consult with local and Statewide PARC and PMH groups in planning and implementation of education and training programs.